**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>MANUEL AGRIPINO,<br><br>Debtor. | Bankruptcy Case No. 25-13109 TBM<br>Chapter 7 |
| CRAIG SPARROW; SHARON SPARROW;<br>WETCO 1100 N ETHEL AVE, LLC;<br>WETCO 4th ST CR 29 CR 40 LLC;<br>WETCO SOLAR FARM LLC; and<br>WESTERN EQUIPMENT & TRUCK, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MANUEL AGRIPINO,<br><br>Defendant. | Adv. Pro. No. 26-1025 TBM |

# ORDER DENYING MOTION TO WITHDRAW DEEMED ADMISSIONS AND DENYING SUMMARY JUDGMENT

## I. Introduction.

Debtor-Defendant, Manuel Agripino (the "Defendant")[1], filed for protection under Chapter 7 of the Bankruptcy Code,[2] commencing *In re Manuel Agripino*, Bankr. Case No. 26-13109 TBM (Bankr. D. Colo.) (the "Main Case"). On January 22, 2026, Craig Sparrow, Sharon Sparrow, WETCO 1100 N ETHEL AVE, LLC, WETCO 4th ST CR 29 CR 40 LLC, WETCO SOLAR FARM LLC, and Western Equipment & Truck, Inc.

[1] Although the Court refers to Manuel Agripino as the "Defendant" because he is a defendant in this Adversary Proceeding, he also is a debtor in bankruptcy. Accordingly, some materials refer to him as the "Debtor." In the context of this dispute, "Defendant" and "Debtor" refer to the same person: Manuel Agripino.

[2] All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

(together, the “Plaintiffs”),filed a “Complaint Objecting to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A), (4), and (6) and Related Claims” (Docket No. 1),[3] thereby commencing this Adversary Proceeding, *Sparrow et al v. Agripino (In re Agripino)*, Adv. Pro. No. 26-1025-TBM (Bankr. D. Colo.) (the “Adversary Proceeding”). The Plaintiffs filed an “Amended Complaint Objecting to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A), (4), and (6) and Related Claims” (Docket No. 5, the “Amended Complaint”) in the Adversary Proceeding not long after. The Amended Complaint is the Plaintiffs’ operative pleading. Through the Amended Complaint, the Plaintiffs requested that an alleged debt of more than $1.8 million be declared nondischargeable under Sections 523(a)(2)(A), (a)(4), and (a)(6).

During the course of both the Bankruptcy Case and Adversary Proceeding, the Defendant failed to respond to discovery requests. As a result of the Defendant’s failure to respond to requests for admission in the Adversary Proceeding, the requests were deemed admitted pursuant to Fed. R. Civ. P. 36(a)(3) (made applicable by Fed. R. Bankr. P. 7036). The Plaintiffs filed a “Motion for Summary Judgment” (Docket No. 32, the “MSJ”) relying, in part, on the deemed admissions. Thereafter, the Defendant filed a “Motion to Withdraw or Amend Deemed Admissions Pursuant to Fed. R, Civ. P. 36(b)” (Docket No. 37, the “Motion to Withdraw Admissions”) and contested the MSJ, arguing, in part, that the Court could not grant the MSJ based on the deemed admissions. Later, the Defendant provided responses to the admissions and other discovery requests. Instead of admitting or denying, the Defendant invoked the Fifth Amendment of the Constitution of the United States (the “Fifth Amendment”) as a basis for not responding. The Court must now determine whether the Defendant should be allowed to withdraw the deemed admissions and amend them with his late responses invoking the Fifth Amendment and whether the Plaintiffs are entitled to summary judgment on their nondischargeability claims under Section 523. The Court denies both the Motion to Withdraw Admissions and the MSJ.

## II. <u>Jurisdiction and Venue</u>.

The Court has jurisdiction to enter final judgment in this nondischargeability dispute pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C § 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate); (b)(2)(I) (determinations as to the dischargeability of particular debts); and (b)(2)(O) (other proceedings affecting the adjustment of the debtor-creditor relationship). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409. The Plaintiffs and the Defendant agree that this Court has jurisdiction to enter final judgment and that venue is proper in the Court. (*See* Docket No. 15.)

---

[3] Unless otherwise indicated, the Court will refer to particular documents contained in the CM/ECF docket for this Adversary Proceeding, using the convention: “Docket No. ___.” Similarly, the Court will refer to particular documents filed in the CM/ECF docket for the Main Case using the convention: “Main Case Docket No. ___.”

## III. Procedural Background.[4]

### A. The Defendant's Main Case.

#### 1. The Defendant's Petition, Statement of Financial Affairs, and Schedules.

The Defendant, through counsel Lois Tabberson Gray, filed for protection under Chapter 7 of the Bankruptcy Code on May 21, 2025, in the case captioned: *In re Manuel Agripino*, Bankr. Case No. 25-13109 TBM (Bankr. D. Colo.) (the "Main Case"). In Part 1 of the Defendant's Petition, the Defendant listed "FODS Rocky Mountain Oil & Gas, Inc." as a name he had used in the past 8 years. (Main Case Docket No. 1 at 1.) In the Defendant's Statement of Financial Affairs ("SOFA"), he swore that he was not married. (Main Case Docket No. 1 at 8.) In Part 4 of the Defendant's SOFA, he stated that he had been party to three lawsuits within the year prior to filing for bankruptcy: "Canvas Credit Union v. Debtor in the Weld County District Court; Westwood Funding Solutions v. Rocky Mountain Oil and Gas and Manuel Agripino in the Supreme Court State of NY; and Blas Chavez Trucking Inc. v. Rocky Mountain Oil and Gas, and Manuel Agrapino [sic] 2022CV30575." (*Id.* at 10.) In Part 11 of the SOFA, the Defendant indicated that he had owned one business in the 4 years before he filed for bankruptcy: Rocky Mountain Oil and Gas Consultants. (*Id.* at 13.)

In Schedule A/B, the Defendant identified $37,550 in assets. (*Id.* at 17-21.) In Schedule E/F, the Defendant listed $253,511 in non-priority unsecured claims. (*Id.* at 26-35.) The Defendant did not list any of the Plaintiffs as creditors in his Schedules. On Schedule I, the Defendant stated that he was employed by MelMan Environmental Corp ("Melman Environmental") as an engineer. He did not list any ownership interest in MelMan Environmental.

#### 2. The Discovery Dispute.

On July 31, 2025, in the Main Case, Western Equipment & Truck, Inc. ("Truck"), and Craig and Sharon Sparrow (together, the "Sparrows") filed a motion to examine the Defendant under Fed. R. Bankr. P. 2004. (Main Case Docket No. 16.) The Sparrows and related entities also filed a motion to extend the deadline to object to dischargeability of debt. (Main Case Docket No. 17.) In those motions, the Sparrows reported the existence of a substantial dispute between them and the Defendant, and also alleged that the Defendant had failed to disclose assets and list the Sparrows and related entities in his Schedules. The Court granted the Fed. R. Bankr. P. 2004 motion. (Main Case Docket No. 19.) The Court also entered an order extending the deadline to object to discharge. (Main Case Docket No. 24.)

---

[4] The Court takes judicial notice of the docket entries in this Adversary Proceeding as well as the Main Case. *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket and the facts that are part of public records).

On September 5, 2026, Truck and the Sparrows noticed the deposition of the Defendant. (Main Case Docket No. 28.) A few days later, the Defendant amended his SOFA and Schedules. In Part 1 of his SOFA, he now identified himself as "married." He added two creditors to Schedule E/F: LaSalle Oil Company with a claim of $2,856,424.00; and M&S Oil and Gas with a claim of $528,496.57. The Defendant also amended Schedule I to indicate that his occupation at MelMan Environmental was as a "project manager" rather than as engineer. He did not make any other amendments.

On September 17, 2025, Eric Coakley entered his appearance as legal counsel on behalf of the Defendant. (Main Case Docket No. 41.) The next day, the Defendant, through Mr. Coakley, filed a "Motion for Protective Order and to Quash Subpoena." (Main Case Docket No. 42, the "Motion to Quash"). Truck and the Sparrows submitted a "Response to Debtor's Motion for Protective Order," opposing the Motion to Quash. (Docket No. 43.) After determining that the subpoena was deficient, the Court granted the Motion to Quash. The Court also denied the request for Protective Order without prejudice in light of the Court's quashing of the deficient subpoena. (Main Case Docket No. 44.)

On October 14, 2025, the Defendant filed a "Renewed Motion for Protective Order." (Docket No. 52, the "Second Motion for Protective Order.") Truck and the Sparrows opposed the Second Motion for Protective Order. (Main Case Docket No. 53.) While this dispute was brewing, on October 27, 2025, counsel for Truck and Sparrow sent an email to Chambers pursuant to L.B.R. 7026-1 to request a hearing to resolve a discovery dispute.

The Court held a hearing on the foregoing discovery issues in the Main Case on November 12, 2025. (Main Case Docket No. 66.) At the discovery dispute hearing, the Court found that the Defendant had failed to comply with his obligations under the applicable discovery rules and ordered the Defendant to appear for a deposition on December 11, 2025, as well as to produce documents responsive to the vast majority of the discovery requests, some by November 19, 2026, and some by November 26, 2025. (Main Case Docket No. 66.)

On November 17, 2025, Truck and the Sparrows filed a "Motion for Fees and Costs Pursuant to Fed. R. Civ. Proc. 37(a)(5)(B) Made Applicable Pursuant to Bankruptcy Rule 7037." (Docket No. 71, the "Fees Motion.") The Defendant filed a Response in opposition. (Main Case Docket No. 73.) More hearings followed. (Main Case Docket Nos. 82 and 103.) After the close of evidence at a trial on the Fees Motion, the parties reported that they had reached an agreement resolving the contested matter. Specifically, the parties agreed that the Court should enter a stipulated order providing for payment in the total amount of $8,390.22 by the Defendant to the Truck and the Sparrows. Mr. Coakley agreed that he would pay Truck and the Sparrows in the event that all or a portion of the amounts agreed to was not paid by the Defendant. The parties agreed to submit a stipulated order and a motion to approve stipulated order to the Court. (Main Case Docket No. 103.) Though it took a while, and more disputes ensued, the parties eventually agreed on a proposed motion

and form of order. (Main Case Docket No. 119.) The Court issued an order approving the stipulation on May 28, 2026. (Main Case Docket No. 120.)

### 3. <u>Status of the Main Case</u>.

In the meantime, in the Main Case, the Defendant received his discharge on May 11, 2026. (Main Case Docket No. 112.) On June 18, 2026, Berken Cloyes, PC ("Berken Cloyes") entered its appearance as additional counsel of record. On May 8, 2026, Mr. Coakley filed a motion to withdraw as counsel of record. (Docket No. 111.) Though no one has opposed Mr. Coakley's withdrawal, Mr. Coakley has not filed a certificate on non-contested matter pursuant to L.B.R. 9013-1. As a result, Mr. Coakley's request to withdraw has not been brought before the Court for decision. So, at present, Ms. Tabberson Gray, Mr. Coakley, and Berken Cloyes are all counsel of record for the Defendant in the Main Case. The Defendant is fully represented.

## B. <u>The Adversary Proceeding</u>.

On January 22, 2026, the Plaintiffs commenced this Adversary Proceeding. (Docket No. 1.) They amended their Complaint a few weeks later. (Docket Nos. 5-7.) The Amended Complaint is the Plaintiffs' operative pleading. (Docket No. 5.) Through the Amended Complaint, the Plaintiffs asserted that the Defendant is indebted to them (presumably for pre-petition debt). Further, the Plaintiffs alleged three separate claims asserting that such debt is nondischargeable under Sections 523(a)(2)(A), (a)(4), and (a)(6). The Defendant, through Mr. Coakley, filed an "Answer to the Amended Complaint," which is the Defendant's operative pleading. (Docket No. 12, the "Answer.") Presently, Mr. Coakley and Berken Cloyes continue to represent the Defendant.

The Court held a Pretrial Scheduling Conference on March 24, 2026 at which it set a five-day trial on the Amended Complaint and Answer to commence on November 9, 2026, along with other deadlines. (Docket No. 15.) During the Scheduling Conference, the Court advised the parties that the trial setting was a "firm" setting. Thereafter, the Court issued a "Scheduling Order Under Fed. R. Civ. P. 16(b) and Fed. R. Bankr. P. 7016." (Docket No. 16, the "Scheduling Order.") In the Scheduling Order, the Court reminded the parties:

> The matter is set for a **five-day in person trial** on the Court's trial docket commencing on **Monday, November 9, 2026, at 9:00 a.m.**, in Courtroom E, U.S. Bankruptcy Court, U.S. Custom House, 721 19th Street, Denver, Colorado 80202. **This is a firm trial commencement date.** Trial shall be conducted on November 9, 10, 12, 13, and 16, 2026.

(Docket No. 16 at 5 ¶ 14, emphasis in original.) The Court also established August 31, 2026, as the deadline for the filing of dispositive motions and October 15, 2026, as the

deadline for completion of fact and expert discovery, along with other pre-trial deadlines. (Docket No. 16.)

### 1. <u>Counsel in the Adversary Proceeding</u>.

On May 8, 2026, following the discovery dispute in the Main Case, Mr. Coakley filed a "Motion of Eric R. Coakley to Withdraw as Counsel for Defendant Manuel Agripino and to Extend Pending Deadlines" in this Adversary Proceeding. (Docket No. 20, the "Coakley Motion to Withdraw.") In the Coakley Motion to Withdraw, Mr. Coakley requested that the Court allow him to withdraw as counsel for the Debtor in the Adversary Proceeding on the ground that a non-waivable conflict of interest under Colorado Rule of Professional Conduct 1.7 prevented his continued representation of the Debtor. Mr. Coakley also requested, generally, that the Court extend all pending deadlines set forth in the Scheduling Order by 60 days in order in give the Debtor time to engage successor counsel. Alternatively, Mr. Coakley requested that the Court "schedule a status conference at the Court's earliest convenience to address an appropriate extension or modification of the Scheduling Order in light of the withdrawal."

Mr. Coakley did not file and serve a separate notice of the Coakley Motion to Withdraw pursuant to L.B.R. 9013-1 as required by L.B.R. 9010-4(a)(2). Accordingly, on May 11, 2026, the Court issued an "Order Requiring Attorney's Compliance with Local Bankruptcy Rule 9010-4 in which it notified Mr. Coakley that he was required to comply with the foregoing Rules and warned that if Mr. Coakley failed to do so by May 18, 2026, the Court could deny the Motion to Withdraw without further notice. (Docket No. 23.)

The same day, May 11, 2026, the Plaintiffs filed a Limited Objection to the Coakley Motion to Withdraw. (Docket No. 22.) Though the Plaintiffs took no position about Mr. Coakley's proposed withdrawal from representation of the Debtor, the Plaintiffs opposed the request for a general extension of all deadlines in the Adversary Proceeding on the ground that Mr. Coakley has not stated good cause for such extension.

On May 21, 2026, the Court denied the Coakley Motion to Withdraw, finding, among other things, that Mr. Coakley had failed to notify the Debtor (through a formal notice) about various upcoming deadlines, including discovery and disclosure deadlines, and conference and trial dates, as required by L.B.R. 9010-4(a)(1)(I). The Court also denied the requests for extension.

On May 28, 2026, Mr. Coakley filed a "Renewed Motion of Eric R. Coakley to Withdraw as Counsel for Defendant Manuel Agripino and to Extend Pending Deadlines." (Docket No. 28, the "Renewed Coakley Motion to Withdraw.") In the Renewed Coakley Motion to Withdraw, Mr. Coakley advised the Debtor that "responses and objection to written discovery served May 27, 2026" were due on June 29, 2026. The next day, May 29, 2026, Mr. Coakley filed a notice of the Renewed Coakley Motion to Withdraw pursuant to L.B.R. 9013-1, including a certificate of service which showed

that he had mailed a copy of the notice and the Renewed Coakley Motion to Withdraw to the Defendant via U.S. Mail, first class, postage prepaid. (Docket No. 29.) A few weeks later, on June 18, 2026, Berken Cloyes entered an appearance on behalf of the Debtor in the Adversary Proceeding. (Docket No. 31.) Since that time, Mr. Coakley has taken no further action in the Adversary Proceeding and has not yet filed a certificate pursuant to L.B.R. 9013-1(c). As such, the Court has not ruled on the Renewed Coakley Motion to Withdraw. So, Mr. Coakley remains counsel of record for the Defendant along with Berken Cloyes.

**2. <u>The Discovery Requests</u>.**

On May 27, 2026, the Plaintiffs served the Defendant with their "Combined Requests for Admissions, Interrogatories, and Requests for Production of Documents and Tangible Things." (Docket No. 32-1 the "Discovery Requests.") The Discovery Requests contained 105 Requests for Admission ("RFA"s). The Defendant's responses to the Discovery Requests were due June 26, 2026. The Defendant did not timely respond to the Discovery Requests. The Defendant still has not fully responded to the Discovery Requests.

At the time that the Discovery Requests were served, Mr. Coakley was counsel for the Defendant. Per the Renewed Coakley Motion and accompanying certificate of service, Mr. Coakley timely notified the Debtor of the Debtor's obligation to respond to the Discovery Requests the day after they were served. (Docket Nos. 28 and 29.) Meanwhile, *before the Discovery Requests were due*, Berken Cloyes joined the fray on June 18, 2026. So, two law firms were representing the Defendant in relation to the Discovery Requests before they were due.

**3. <u>The Motion for Summary Judgment and the Motion to Withdraw Admissions</u>.**

On July 22, 2026, the Plaintiffs filed their "Motion for Summary Judgment With Respect to Claims Pursuant to 11 U.S.C. § 523(a)(2)(A), (4), and (6)." (Docket No. 32, the "MSJ.") In the MSJ, the Plaintiffs seek entry of summary judgment against the Defendant on all claims (under Sections 523(a)(2)(A), (a)(4), and (a)(6)). In so doing, the Defendant relied, in part, on the unanswered 105 RFAs in the Discovery Requests, which RFAs are deemed admitted pursuant to Fed. R. Civ. P. 36(a)(3) (made applicable by Fed. R. Bankr. P. 7036) as a result of the Defendant's failure to timely respond to them.

On August 12, 2026, the Defendant filed "Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment." (Docket No. 36, the "MSJ Response.") Simultaneously, the Defendants submitted "Defendant's Motion to Withdraw or Amend Deemed Admissions Pursuant to Fed. R. Civ. P. 36(b)." (Docket No. 37, the "Motion to Withdraw Admissions.") The Defendant also filed a "Declaration of Manuel Agripino." (Docket No. 38, the "Declaration.") In the Motion to Withdraw Admissions, the Defendant requested that the Court allow him to "withdraw and amend the admissions

deemed against him by operation of Fed. R. Civ. P. 36(a)(3)." In the MSJ Response, the Defendant contested the Plaintiffs' right to the relief requested therein, in part, on the ground that, since the Court should allow the Defendant to withdraw the deemed admissions, it could not grant the MSJ based on the deemed admissions.

In the Declaration, the Defendant addressed a number of the substantive allegations in MSJ. In addition, he offered the following statements in support of the Motion to Withdraw Admissions:

> 21. I first learned that Plaintiffs had served Requests for Admission in this proceeding when I heard about it from my new attorneys.
>
> 22. I was not provided with a copy of the Requests for Admission before the response deadline of June 26, 2026.
>
> 23. I do not admit the matters set forth in Plaintiffs' Requests for Admission. I did not authorize anyone to admit them on my behalf, and I did not knowingly permit the response deadline to pass.
>
> 24. Had I been asked to respond to the Requests for Admission, I would have denied all allegations of forgery, bad conduct and the rest.
>
> 25. I am prepared to respond to the Requests for Admission in writing promptly, and to appear for deposition, if the Court permits.

(Docket No. 38 at 4-5.) The foregoing contradicts the Renewed Coakley Motion and accompanying certificate of service wherein Mr. Coakley timely notified the Debtor of the Debtor's obligation to respond to the Discovery Requests the day after they were served.

On August 31, 2026, the Plaintiffs filed an "Objection" to the Motion to Withdraw Admissions. (Docket No. 42, the "Withdraw Objection.") They also submitted a "Reply" in support of the MSJ. (Docket No. 43, the "MSJ Reply.") In the Withdraw Objection, the Defendant urged the Court not to allow withdrawal of the deemed admissions. Meanwhile, in the MSJ Reply, the Defendant argued that the admissions provided a basis for granting summary judgment on all of the Plaintiffs' claims.

On September 8, 2026, the Plaintiffs filed a "Supplement" to the Withdraw Objection. (Docket No. 47, the "Supplement to Withdraw Objection.") Therein, they reported: "On August 20, 2026, the Defendant, through his counsel Sean Cloyes, agreed to respond to the Discovery Requests by September 4, 2026, and to sit for a deposition on September 22, 2026." However, "counsel for the Plaintiffs did not receive

a single response to the Discovery Requests on or before September 4, 2026." (Docket No. 47 ¶¶ 7 and 8.)

On September 9, 2026, Aaron A. Garber, counsel for the Plaintiffs, sent an email pursuant to L.B.R. 7026-1(d)(2) to the Court, requesting that the Court hold a hearing on another discovery dispute arising from the Defendant's failure to respond to various document requests in advance of a scheduled deposition. The Court set a hearing on the matter for September 21, 2026. (Docket No. 48.)

Thereafter, on September 16, 2026, the Plaintiffs filed a "Motion to Vacate Discovery Dispute Hearing" wherein they reported that on September 11, 2026, the Defendant had provided responses to the Discovery Requests wherein "the Defendant pled the fifth to every request for admission, interrogatory, and request for documents set forth in the Document Requests." (Docket No. 52.) The Plaintiffs, therefore, requested that the Court vacate the September 21, 2026 hearing. The Plaintiffs also filed a Supplement to the MSJ. (Docket No. 53, the "MSJ Supplement.") To the MSJ Supplement, the Plaintiffs attached as Exhibit A a copy of the Defendant's Responses to the Discovery Requests. (Docket No. 53 at 6-43, the "Late Discovery Responses.")

In the Late Discovery Responses, with respect to each RFA, the Defendant responded:

> Defendant objects and declines to admit or deny. Defendant asserts his privilege against self-incrimination under the Fifth Amendment to the United States Constitution. This response is an objection under Fed. R. Civ. P. 36(a)(5) and Fed. R. Bankr. P. 7036; it is not an admission, and Defendant does not admit the matter asserted. Defendant reserves the right to respond on the merits when the criminal charges are resolved.

(Docket No. 53 at 10-33.) With respect to each interrogatory, the Defendant responded:

> Defendant objects and declines to admit or deny. Defendant asserts his privilege against self-incrimination under the Fifth Amendment to the United States Constitution. This response is an objection under Fed. R. Civ. P. 33(b)(4) and Fed. R. Bankr. P. 7033. Because the Defendant states an objection rather than an answer, no verification under oath is required. Defendant reserves the right to answer on the merits when the criminal charges are resolved.

(Docket No. 53 at 33-37.) Finally, with respect to each request for production, the Defendant responded:

> Defendant objects and declines to produce. Defendant asserts his privilege against self-incrimination under the Fifth Amendment to the United States Constitution. This response is an objection under Fed. R. Civ. P. 34(b)(2) and Fed. R. Bankr. P. 7034. Defendant reserves the right to produce responsive materials when the criminal charges are resolved, or under a stipulation or protective order preserving the privilege.

(Docket No. 53 at 37-42.)

In the MSJ Supplement, the Plaintiff asserted that the Court was permitted to draw a negative inference from the Defendant's invocation of his Fifth Amendment privilege, and argued:

> The Debtor's subsequent invocation of the Fifth Amendment provides an independent evidentiary basis for the Court to draw an adverse inference concerning the same facts addressed by the Requests for Admission as well as all other discovery in this Adversary Proceeding. Put another way, even if the Court permits the Debtor to withdraw his admissions, the adverse inference from the Debtor having plead [sic] the Fifth Amendment is that the requests are none the less [sic] deemed admitted.
>
> [] Therefore, even if the Withdraw Motion is granted the evidentiary predicate for granting Plaintiffs' Summary Judgment Motion still exists as the record establishes that there is no genuine dispute of material fact and that Plaintiffs are entitled to judgment as a matter of fact and law.

On September 24, 2026, the Defendant filed a "Limited Response" to the MSJ Supplement. (Docket No. 58, the "Response to MSJ Supplement.") In the Response to MSJ Supplement, the Defendant argued that, notwithstanding his invocation of the Fifth Amendment privilege, the evidence did not support entry of summary judgment.

## IV. <u>The Motion to Withdraw Admissions</u>.

### A. <u>Governing Legal Standard for Motions to Withdraw or Amend Admissions</u>

Fed. R. Civ. P. Rule 36(a)(1), which is made applicable to this Adversary Proceeding by Fed. R. Bankr. P. 7036, provides:

> A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:
>
> (A) facts, the application of law to fact, or opinions about either; and
>
> (B) the genuineness of any described documents.

Critically, with respect to the timing for responding to requests for admission, Fed. R. Civ. P. 36(b)(3) dictates: **"A matter is deemed admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection address to the matter and signed by the party or its attorney."** (Emphasis added.)

Pursuant Fed. R. Civ. P. 36(b):

> A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if [1] it would promote the presentation of the merits of the action and [2] if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding.

In *Raiser v. Utah Cnty.*, 409 F.3d 1243 (10th Cir. 2005), the Tenth Circuit Court of Appeals ruled that the first part of the Rule 36(b) test "'emphasizes the importance of having the action resolved on the merits, and is satisfied when upholding the admissions would practically eliminate any presentation of the merits of the case.'" *Id.* at 1246 (quoting *Perez v. Miami-Dade County*, 297 F.3d 1255, 1265 (11th Cir. 2002)). Meanwhile, the second part of the test requires the party who obtained the admission to show that it would be prejudiced by the withdrawal of the admission. *Id.* Per the Tenth Circuit:

> Mere inconvenience does not constitute prejudice for this purpose. "The prejudice contemplated by Rule 36(b) is not simply that the party who obtained the admission now has to convince the jury of its truth. Something more is required." *Bergemann v. United States*, 820 F.2d 1117, 1121 (10th Cir.1987). In particular, "[p]reparing a summary judgment motion in reliance upon an erroneous admission does not constitute prejudice." *Kirtley v. Sovereign Life Ins. Co. (In re Durability Inc.)*, 212 F.3d 551, 556 (10th Cir.

> 2000) (internal quotation marks omitted). "The prejudice contemplated by Rule 36(b) . . . relates to the difficulty a party may face in proving its case, *e.g.*, caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously deemed admitted." *Hadley*, 45 F.3d at 1348 (internal quotation marks omitted).

*Id.*; *see also Gutting v. Falstaff Brewing Corp.*, 710 F.2d 1309, 1314 (8th Cir. 1983) (same, quoting *Brook Village N. Assocs. v. General Elec. Co.*, 686 F.2d 66, 70 (1st Cir.1982)); *Kovach v. Navient Sols., Inc.*, 2018 WL 3659394, at *5 (D. Colo. Aug. 2, 2018) (quoting *Falstaff Brewing*). "Reliance on admissions in preparing for trial may show prejudice. Allowing the withdrawal of admissions on the eve of trial could unfairly disrupt trial preparations." *Kovach*, 2018 WL 3659394, at *5 (citing *Ropfogel v. United States*, 138 F.R.D. 579, 583 (D. Kan. 1991) and *U.S v. Golden Acres, Inc.*, 684 F. Supp. 96, 99 (D. Del. 1988)). As an overarching matter, the Court's focus must be on the "'effect upon the litigation and prejudice to the resisting party rather than [ ] on the moving party's excuses for an erroneous admission.'" *Kirtley v. Sovereign Life. Ins. Co. (In re Durability)*, 212 F.3d 551, 556 (10th Cir. 2000) (quoting *F.D.I.C. v. Prusia*, 18 F.3d 637, 640 (8th Cir. 1994)). *See also U.S. v. 316 75th Street SW Albuquerque, NM 97121*, 2023 WL 6121917, at * 2 (D.N.M. Sept. 19, 2023) (same). In other words, "[t]he prejudice contemplated by Rule 36(b) . . . relates to the difficulty the resisting party may face in proving its case, 'not simply that the party who obtained the admissions now has to convince the [factfinder] of its truth.'" *316 75th Street*, 2023 WL 6121917, at *2 (quoting *Bergemann v. U.S.*, 820 F.2d 1117, 1121 (10th Cir. 1987)) (bracketed language added). Whether to grant a motion under Rule 36(b) is discretionary with the trial court. *E.g.*, *Raiser v. Utah Cnty.*, 409 F.3d. 1243, 1245-46 (10th Cir. 2005).

In *Raiser*, the Tenth Circuit Court of Appeals found that, because the admissions at issue conceded the core elements of the plaintiff's case and, indeed, formed the basis for the district court's grant of summary judgment, the first part of the test was met. 409 F.3d at 1246. And, because only two weeks had passed between the time that the defendant filed its summary judgment motion and the time that the plaintiff moved to withdraw his deemed admission, nothing in the record showed that the defendant had suffered the kind of prejudice contemplated by Rule 36. *Id.* Under the circumstances, the circuit court determined that the district court had abused its discretion by denying the plaintiff's motion to withdraw his deemed admissions. On the other hand, in *Kovach*, the court determined that allowing the plaintiff to withdraw its admissions would result in the defendant's suddenly having to obtain evidence to prove certain of its allegations only one week before trial. Because allowing withdrawal would unfairly disrupt the defendant's trial preparations, the court found prejudice sufficient to support denial of the plaintiff's motion to withdraw. *Kovach*, 2018 WL 3659394, at *5-6. *See also Ropfogel v. U.S.*, 138 F.R.D. 579, 584 (D. Kan. 1991) ("[W]hen there is insufficient time before trial for that party to obtain the necessary evidence or witnesses, prejudice of the kind contemplated by Rule 36(b) is shown").

The Court notes that, in *Raiser*, 409 F.3d at 1246, the Tenth Circuit was construing an earlier iteration of Fed. R. Civ. P. 36. However, since the Rule was "amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules," and since such "changes are intended to be stylistic only," the Court determines that *Raiser* and other pre-2007 case law outlining the standards for evaluation of Fed. R. Civ. P. 36(b) motions continue to apply to the current version of the Rule. *See* Fed. R. Civ. P. 36 advisory committee's note to 2007 amendment; *see also*, *e.g.*, *316 75th Street*, 2023 WL 6121917 (post-2007-amendment case applying *Raiser* standard).

**B. <u>The Court Denies the Motion to Withdraw Admissions</u>.**

**1. <u>The Parties' Arguments</u>.**

In the Motion to Withdraw Admissions, the Defendant asserted that the Court should allow the withdrawal or amendment of the admissions because doing so would promote the presentation of the merits of the action. Indeed, the Defendant asserted, the deemed admissions established every contested element of the claims. Therefore, if they stood, the proceeding would be resolved without any trier of fact's ever hearing any evidence at all. The Defendant contended that the Plaintiffs would suffer no prejudice if the withdrawal were allowed.

In the Withdraw Objection, the Plaintiffs disagreed, arguing that the Defendant had repeatedly abused the discovery process and had run out the clock on discovery. If the Defendant were allowed to provide late discovery responses or deposition testimony that disclosed information that would necessitate the need for third-party discovery after or even close to the discovery cutoff, the Plaintiffs argued, they would most certainly be prejudiced since the discovery cutoff would leave them no time to seek such further discovery.

**2. <u>Analysis of the Motion to Withdraw Admissions</u>**

**a. <u>Permitting Withdrawal of the Admissions Would Promote the Presentation of the Merits of the Action</u>.**

In this case, the Plaintiffs' MSJ is predicated, in part, on the assumption that the deemed admissions meet the elements of each of their claims and thus form the basis for entry of summary judgment on all of the Plaintiffs' claims. As such, the Court easily decides that permitting withdrawal of the deemed admissions would promote the presentation of the merits of the action. But whether allowing withdrawal of the admissions would result in prejudice to the Plaintiffs is a far more complicated issue.

**b. <u>Allowing Withdrawal of the Admissions would Prejudice the Plaintiffs in Maintaining the Action on the Merits</u>.**

The Defendant moved to withdraw the deemed admissions on August 12, 2026 — more than a month and a half after the Defendant failed to respond to the Discovery Requests. The Motion to Withdraw Admissions was presented only about two months prior to the October 15, 2026 discovery cutoff date and three months before the trial. The Motion to Withdraw Admissions seems to have been triggered only because of the MSJ (dated July 22, 2026).

Meanwhile, on May 28, 2026, the Defendant had been served with a copy of the Renewed Coakley Motion to Withdraw, wherein Mr. Coakley affirmatively advised the Defendant that "responses and objection to written discovery served May 27, 2026" were due on June 29, 2026. (Docket No. 29.) Thus, to the extent that the Defendant suggests that there was no reason that he should have been aware of his obligation to respond to the Discovery Requests prior to the time of his declaration, the Court rejects such contention. The Court finds that the Defendant was represented by both Mr. Coakley and Berken Cloyes *before the deadline to respond to the Discovery Requests.*

But even assuming that the Defendant did not know about the Discovery Requests until the MSJ was filed, he did not proactively respond. Instead, he waited three more weeks and then filed the Motion to Withdraw Admissions stating his willingness to respond to the Discovery Requests (without actually providing any responses at all) and to later sit for a deposition (again, without actually agreeing to do so in the immediate future). Then, another month after that, on September 11, 2026, he finally provided the Late Discovery Responses, invoking (for the first time) his Fifth Amendment privilege in response to all RFAs, interrogatories, and requests for production. Eleven days later, with only 23 days left before the discovery cutoff date, the Defendant finally sat for a deposition and, again, invoked the Fifth Amendment in response to all of the Plaintiffs' questions.

Coupled with the Defendant's discovery abuse in the Main Case, it is hard for the Court to view the Defendant's delay in responding to Discovery Requests in the Adversary Proceeding and in sitting for a deposition as anything other than a conscious and consistent effort to delay discovery and impede the litigation process. Indeed, by delaying the deposition and waiting to provide the Late Discovery Response until September 22, 2026, the Defendant made it exceeding difficult for the Plaintiffs, who had acted diligently, to seek further discovery from third parties that could be completed prior to the discovery deadline. Because the effect on the litigation is plain, so too is the prejudicial effect of allowing the withdrawal. *Kovach*, 2018 WL 3659394, at *5-6. (discussing prejudicial effect of withdrawing admissions on eve of trial).

In exercising its discretion under Fed. R. Bankr. P. 36(b), the Court also considers the larger context and the Defendant's proposed invocation of the Fifth Amendment. The Defendant elected, voluntarily, to file for bankruptcy protection and obtain a discharge of pre-petition debts. Now, when the Plaintiffs have questioned the

dischargeability of debts allegedly owed by the Defendant to the Plaintiffs, the Defendant is trying to use the Fifth Amendment as both a sword and shield: to obtain a discharge but refuse to provide any information about his actions. Through the Motion to Withdraw Admissions, the Defendant wants the Court to allow the withdrawal of all the 105 RFAs deemed admitted under Fed. R. Civ. P. 36(a)(3) — but he still won't answer the RFAs. This is a notable distinction from most cases in which the withdrawal of Fed. R. Civ. P. 36(a) admissions is permitted to allow the responding party to actually answer the requests for admission on the merits.

Instead, after securing withdrawal of all the 105 RFAs deemed admitted under Fed. R. Civ. P. 36(a)(3), the Defendant proposes to substitute the Late Discovery Response wherein the Defendant refuses to produce any documents, refuses to answer every interrogatory, and refuses to respond to any RFA. Why? In response to all 105 RFAs, the Defendant states this (105 times):

> Defendant objects and declines to admit or deny. Defendant asserts his privilege against self-incrimination under the Fifth Amendment to the United States Constitution. This response is an objection under Fed. R. Civ. P. 36(a)(5) and Fed. R. Bankr. P. 7036; it is not an admission, and Defendant does not admit the matter asserted. Defendant reserves the right to respond on the merits when the criminal charges are resolved.

In the Preliminary Statement at the beginning of the Late Discovery Response, the Defendant promised:

> Defendant does not assert the privilege wholesale. He asserts it separately as to each Request for Admission . . . and he identifies for each the subject matter that gives rise to the danger of incrimination.

But, the Defendant did not do that. Instead he simply repeated the same verbatim statement asserting the Fifth Amendment 105 times. The Late Discovery Response is an improper wholesale assertion of the Fifth Amendment privilege. *See U.S. v. $493,850.00 in U.S. Currency*, 2006 WL 163570, at *8 (D. Ariz. Jan, 23, 2006) ("The Court finds the blanket invocation of the Fifth Amendment privilege is an insufficient response under Rule 36 . . .and the requests for admission must be deemed admitted."); *Am. Eagle Bank v. Friedman (In re Friedman)*, 543 B.R. 833, 841, 42 (Bankr. N.D. Ill. 2015) ("[A] blanket assertion of [Fifth Amendment] privilege simply will not suffice to establish the 'reasonable cause to apprehend danger from a direct answer.'"; "Having failed to provide sufficient information, the Debtor's blanket assertion of privilege is insufficient to invoke the privilege.").

But, there are many other reasons why, at this late stage, asserting the Fifth Amendment privilege in the Late Discovery Response doesn't work. The Defendant

already appears to have waived the Fifth Amendment privilege because he did not timely assert it. The Fifth Amendment privilege "may not be relied upon unless it is invoked in a *timely fashion*." *Roberts v. U.S.*, 445 U.S. 552, 559 (1980) (emphasis added). The Defendant likely waived the Fifth Amendment privilege in his Answer by not raising it. *See Am. Eagle Bank*, 543 B.R. at 842 ("[B]y answering a complaint, the defendant runs the risk of waiving his Fifth Amendment privilege when he admits a fact and thereby is required to disclose those details."). Many of the RFAs pertain to issues mirroring the Amended Complaint and Answer. The Defendant also appears to have waived the Fifth Amendment privilege by not timely responding to the Discovery Requests. If the Defendant had an objection, the objection was due within 30 days of the RFAs — not many months later. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, (9th Cir. 1992) ("It is well-established that a failure to object to discovery requests within the time required constitutes a waiver of any objection."); *U.S. v. One Million Three Hundred Twenty-Two Thousand Two Hundred Forty-Two Dollars and Fifty-Eight Cents*, 938 F.2d 433, 439 (3d Cir. 1991) (explaining that a party wishing to assert a Fifth Amendment privilege in response to discovery is "required to assert timely objections in response to individual discovery requests"); *Applied Sys., Inc. v. N. Ins. Co. of N.Y.*, 1997 WL 639235, at *2 (N.D. Ill. Oct. 7, 1997) ("The failure to object to a discovery request in a timely fashion may constitute a waiver of the objection, including objections based on privilege."); *Willett v. Dahlberg*, 2026 WL 628139, at *8 (D.V.I. Mar. 6, 2026) ("But even if the Court were to conclude that [the] requests for admission. . . were not admitted by operation of Rule 36, it would still hold that Willett waived her Fifth Amendment rights by not invoking that protection in a timely manner.").

Furthermore, the assertion of a Fifth Amendment privilege may not be a sufficient objection to the request for admission under Fed. R. Civ. P. 36 because that Rule expressly limits the use of the admission: "An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding." One Court put it this way:

> Plaintiff's mention of the Fifth Amendment right against self-incrimination cannot be considered a sufficient objection to Defendant's requests for admission. Three reasons compel this conclusion. First, Rule 36 itself makes clear that an admission in a civil case does not have incriminatory effect in any separate criminal proceeding: "An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding." Fed. R. Civ. P. 36(b). In light of this language, it is difficult to imagine how the requests for admission could implicate the privilege against self-incrimination. This is particularly the case here, where the admission is based on Plaintiff's refusal to answer.

*Ledet v. Perry Homes*, 2021 WL 2879290, at *3 (W.D. Tex. May 18, 2021).

In any event, the Defendant is proposing to prejudice the Plaintiffs through shield and sword use of the Fifth Amendment privilege. The Defendant initiated the current controversy by filing for bankruptcy protection. In that sense, in the Main Case, the Defendant is effectively like a plaintiff suing its creditors for a discharge. The Plaintiffs did not start the foray into bankruptcy. They only responded by initiating this Adversary Proceeding because the Defendant was trying to discharge the alleged debt. "While it may be true that an individual should suffer no penalty for the assertion of a constitutional right, neither should third parties sued by that individual . . . be placed at a disadvantage." *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1088 (5th Cir. 1979) (quotation omitted). "[I]t would be unfair to permit [the plaintiff] to proceed with his lawsuit and, at the same time, deprive [the defendants] of information needed to prepare [their] defense." *Id.* at 1087. "The plaintiff who retreats under the cloak of the Fifth Amendment cannot hope to gain an unequal advantage against the party he has chosen to sue." *Id.* "To hold otherwise would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as a sword. This he cannot do." *Id.* So, the Court questions the Defendant's new-found Fifth Amendment gambit.

But, even if the Court allowed the Defendant to withdraw his admissions to all the RFAs and then refuse to answer to the RFAs under the Fifth Amendment (per the Late Discovery Response), the result would not be different. That is because the Defendant's assertion of a Fifth Amendment privilege still allows an "adverse inference" to be drawn against the Defendant in civil litigation such as this Adversary Proceeding. *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976) ("the prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them . . ."). If the Defendant refuses to admit the RFAs on the basis of the Fifth Amendment, the Court can make an adverse inference that the RFAs are true or admitted. *Ledet*, 2021 WL 2879290, at *4 ("Plaintiff's failure to properly respond to the requests for admission [and assert a Fifth Amendment privilege] should result in the Court deeming admitting those matters contained in the requests."); *$493,850.00 in U.S. Currency*, 2006 WL 163570, at *8 ("The Court finds the blanket invocation of the Fifth Amendment is an insufficient response under Rule 36 . . . and the requests for admission must be deemed admitted.").

Based on the foregoing, the Court rules that pursuant to Fed. R. Bankr. P. 36(a)(3), all of the Plaintiff's RFAs Nos. 1-105 are deemed admitted (Docket No. 32, Ex 1. at 7-16, collectively, the "Admissions"). The Court denies the Motion to Withdraw Admissions.

## V. Legal Standard Governing Motions for Summary Judgment.

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, as incorporated herein by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a). The moving party bears the initial burden of identifying the basis for its motion and designating those portions of the record which it believes entitles it to judgment. Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such evidence may include those matters that have been deemed admitted pursuant to Fed. R. Civ. P. 36(b). *See Moosman v. Joseph P. Blitz, Inc.,* 358 F.2d 686, 688 (2d Cir. 1966) ("It appears well settled that a failure to respond to a request to admit will permit the [trial court] to enter summary judgment if the facts as admitted are dispositive.") (bracketed language added); *Foxworth v. World Book Encyclopedia, Inc.*, 838 F.2d 466 (Table), 1988 WL 6814, at *1 (4th Cir. Jan. 27, 1988) (determining that district court properly entered summary judgment since no genuine issue of material fact remained for trial after requests for admission were deemed true and citing *Moosman*).[5] In response, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Instead:

> [T]he nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant . . . . To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citations omitted). *See also Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (discussing burdens and citing *Celotex Corp. v. Catrett*); *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1181 (10th Cir. 2013) (nonmoving party has the affirmative duty of coming forward with evidence supporting his claim at summary judgment).

---

[5] If the Defendant had been permitted to withdraw the Admissions and to substitute his Late Discovery Responses invoking his Fifth Amendment rights, his silence alone would not constitute a basis for liability at the summary judgment stage because, under the Rule 56 standard, all reasonable inferences based on his silence must be viewed in the light most favorable to the Defendant, as the non-moving party. *CFTC v. Glenn (In re Glenn)*, 2024 WL 4042956, at *6 (D. Colo. Sept. 4, 2024). However, "silence, in the face of other independent and corroborating evidence" may allow for entry of summary judgment. *Id. See also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995) (holding that defendant's silence must "be weighed in light of other evidence rather than leading directly and without more to the conclusion of guilt or liability") (italics omitted); *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991) ("The negative inference, if any, to be drawn from the assertion of the [F]ifth [A]mendment does not substitute for evidence needed to meet the burden of production."), *cert. denied*, 502 U.S. 1048 (1992); *United States v. Welch,* 2013 WL 1444053, at *19 (D. Colo. Mar. 13, 2013) (recommending that district court grant summary judgment on claim where plaintiff presented facts and evidence in support of its claim because "despite Defendants' invocation of Fifth Amendment privilege, this Court may infer that Plaintiff's facts are uncontroverted where Defendants have offered no [competent] rebuttal evidence"), *report and recommendation adopted*, 2013 WL 1442627 (D. Colo. Apr. 8, 2013).

One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp.*, 477 U.S. at 323-24. Therefore, unsupported, conclusory allegations will not create an issue of fact, and the non-moving party must do more than provide its subjective interpretation of the evidence. *Tran v. Sonic Indus. Servs.*, Inc., 490 Fed. Appx. 115, 117-118 (10th Cir. 2012) ("Summary judgment is appropriate if the non-moving party cannot adduce probative evidence on an element of its claim upon which it bears the burden of proof.") (citing *Rohrbaugh v. Celotex Corp.*, 53 F3.d 1181, 1183 (10th Cir. 1995)). "A party cannot rely entirely on pleadings, but must present significant probative evidence to support its position." *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1247 (10th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "If the nonmoving party fails to make a sufficient showing on an essential element with respect to which [it] has the burden of proof, judgment as a matter of law is appropriate." *Id.* However, "when the evidence could lead a rational fact-finder to resolve the dispute in favor of either party, summary judgment is improper." *C.L. Frates & Co. v. Westchester Fire Ins. Co.*, 728 F.3d 1187, 1189 (10th Cir. 2013). Put slightly differently, in reviewing a motion for summary judgment, the Court must view the facts and evidence in the light most favorable to the nonmoving party (*i.e.,* the Defendant). *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012).

## **VI. Procedural Requirements for Summary Judgment.**

The critical first step in adjudicating a motion for summary judgment is to identify the undisputed facts.[6] Only then can the Court apply the law to the facts and reach a legal conclusion. Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

Procedural rules dictate how the alleged undisputed facts are to be presented and challenged. Fed. R. Civ. P. 56(c) governs the facts alleged by the movant or challenged by the non-movant:

> (c) Procedures.
>
> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made

[6] In light of the Court's ruling denying withdrawal of the deemed Admissions, the Court determines that MSJ Supplement and Response to MSJ Supplement are irrelevant and thus disregards those filings.

for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Then, Fed. R. Civ. P. 56 provides the consequences for "failing to properly support or address a fact":

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

(4) issue any other appropriate order.

The Bankruptcy Court for the District of Colorado supplemented the Federal Rules of Civil Procedure by enacting its Local Bankruptcy Rules. L.B.R. 7056-1 governs summary judgment motions filed in the Bankruptcy Court for the District of Colorado and provides:

(a) Motion and Memorandum in Support. Any motion for summary judgment pursuant to Fed. R. Bankr. P. 7056 must include:

(1) a statement of the burden of proof;

(2) the elements of the claim(s) that must be proved to prevail on the claim(s);

(3) a short and concise statement, in numbered paragraphs containing only one fact each, of the

material facts as to which the moving party contends there is no genuine issue to be tried;

(4) a statement or calculation of damages, if any; and

(5) any and all citations of law or legal argument in support of judgment as a matter of law.

The counterpoint is L.B.R. 7056-1(b), which governs oppositions to motions for summary judgment:

(b) Response and Memorandum in Opposition. Responses in opposition must include:

(1) any competing statements concerning the burden of proof, including burden shifting, together with legal authority supporting such statements;

(2) any defenses to the elements of the claim(s) that must be proved to defeat such claim(s);

(3) a short and concise statement of agreement or opposition, in numbered paragraphs corresponding to those of the moving party, of the material facts as to which it is contended there is a genuine issue to be tried;

(4) a short and concise statement, in numbered paragraphs containing only one fact, of any additional facts as to which the opposing party contends are material and disputed;

(5) a statement or calculation of damages, if any; and

(6) any and all citations of law or legal argument in opposition to judgment as a matter of law.

Each alleged fact or contravention of fact (whether by the movant or the non-movant) must be properly supported. L.B.R. 7056-1(c) tells how:

(c) Supporting Evidence. Each statement by the movant or opponent pursuant to subdivisions (a) or (b) of this Rule, including each statement controverting any statement of material fact by a movant or opponent, must be followed by citation to admissible evidence either by reference to a specific paragraph number of

> an affidavit under penalty of perjury or fact contained in the record. Affidavits must be made on personal knowledge and by a person competent to testify to the facts stated, which are admissible in evidence. Where facts referred to in an affidavit are contained in another document, such as a deposition, interrogatory answer, or admission, a copy of the relevant excerpt from the document must be attached with the relevant passages marked or highlighted.

L.B.R. 7056-1(d) states what happens if a non-movant does not properly contravene alleged undisputed facts:

> (d) Admission of Facts. Each numbered paragraph in the statement of material facts served by the moving party is deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement served by the opposing party.

And L.B.R. 7056-1(g) sets forth the potential consequence for failure to abide by the Rule: "Noncompliance. The Court may deny motions that do not comply with this Rule."

## VII. The Undisputed Material Facts.

In the MSJ, the Plaintiffs presented a series of 139 alleged undisputed material facts in a section entitled "Indisputable Facts." (Docket No. 32 at 6-37, the "Alleged Undisputed Facts.") The Plaintiffs' presentation of such statement of facts generally comports with the procedural requirements (notwithstanding use of the word "indisputable" rather than "undisputed"). In other words, the Plaintiffs generally provided "a short and concise statement, in numbered paragraphs containing only one fact each, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.B.R. 7056-1(a)(3).[7] And, the Plaintiffs "cit[ed] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" in support of the Alleged Undisputed Facts. Fed. R. Civ. P. 56(c)(1)(A).

### A. Most Alleged Undisputed Facts Admitted without Caveat are Undisputed.

In the MSJ Response, the Defendant admits without any sort of qualifying statement the following Alleged Undisputed Facts: 1, 6, 10, 16-19, 21, 22, 43-47, 54, 74,

[7] Fact No. 128 includes multiple subparagraphs identified by letters. The use of subparagraphs is not compliant with the Rules. However, the Plaintiffs have provided citations to record evidence in each paragraph. So, the Court views this deviation as somewhat technical.

128-130, 132-134, 136-137. (MSJ Response at 5-31.) The Court finds that all of Alleged Undisputed Facts Nos. 1, 6, 10, 16-19, 21, 22, 43-47, 54, 74, 129, 130, 132-134, 136-137 are, in fact, undisputed for purposes of summary judgment. However, as discussed below with respect to Alleged Undisputed Fact No. 57, the Court cannot find that the Debtor's statement in subparagraph d of Alleged Undisputed Fact No. 128, is undisputed because there exists a question of fact as to when the Quitclaim Deed referenced in subparagraph d of Alleged Undisputed Fact No. 128 (and evidenced by Exhibit 6 to the MSJ) was executed.

## B. Most Alleged Undisputed Facts Supported by Deemed Admissions are Undisputed.

In the MSJ Response, the Defendant purports to dispute Alleged Undisputed Fact Nos. 3-5, 23, 28, 30-32, 34, 37, 39, 40, 41, 57-61, 63-72, 75-92, 102-108, 112, 113, 115, 116, and 119-127, stating in response: "Disputed. This statement rests **solely** on a deemed admission. Defendant has contemporaneously moved to withdraw that admission under Fed. R. Civ. P. 36(b)." (MSJ Response at 5-31, bolding in original.) With respect to each of the foregoing Alleged Undisputed Facts, the Defendant states that the statement is contravened by either the Defendant's Answer, the Defendant's Affidavit, or both. In so doing, the Defendant misapprehends the evidentiary value of his admissions.

Fed. R. Civ. P. 56(c)(1)(A) expressly identifies "admissions" as one type of competent evidence which a movant may cite in support of a motion for summary judgment. Matters admitted under Fed. R. Civ. P. 36(b), once made, are "conclusively established" unless the court permits the admissions to be withdrawn. The Court has denied the Defendant's Motion to Withdraw Admissions. As such, the admissions are conclusively established and cannot be controverted by other evidence, such as the Defendant's Answer or his Affidavit. Fed. R. Civ. P. 36(b). *See also Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 244 (5th Cir. 2014) (unpublished) ("Rule 36 admissions are conclusive as to the matters admitted and cannot be overcome at the summary judgment stage by contradictory affidavit testimony or other evidence in the record."); *De Gomez v. Adams Cnty.*, 2022 WL 1439113, at *5 (D. Colo. May 6, 2022) (ruling that deemed admissions are conclusively established for purposes of summary judgment); *Hyper Healing, LLC v. Shapiro*, 2021 WL 5334252 at *4 (D.S.C. May 20, 2021) (stating that since defendant's admissions could not be contravened, documents and information sought from plaintiff was irrelevant and denying defendant's motion compel discovery responses from plaintiff). Because each of Alleged Undisputed Facts Nos. 3-5, 23, 28, 30-32, 34, 37, 39, 40, 41, 58-61, 63-72, 75-92, 102-108, 112, 113,[8] 115, and 119[9]-127 is supported by the Defendant's admissions and, in some cases, is

---

[8] Plaintiff cites to RFP No. "678" in support of Alleged Undisputed Fact No. 113. The Defendant acknowledged in the MSJ Objection that he understood the reference as being to RFP No. 68. (MSJ Response at 23.) So too does the Court. RFP No. 68 supports Alleged Undisputed Fact No. 113.

[9] The last sentence of Alleged Undisputed Fact No. 119 is not supported by any of the RFAs cited by the Plaintiff. However, RFA 83, coupled with the other RFAs cited, supports the last sentence. Thus,

also supported by other additional evidence, the Court determines that each of the foregoing Alleged Undisputed Facts is, in fact, undisputed for purposes of summary judgment. However, the Court does not find the same with respect to Alleged Undisputed Facts Nos. 57 and 116.

The Plaintiffs assert in Alleged Undisputed Fact No. 57 that it is undisputed that: "On October 7, 2024, the Debtor executed a forged quitclaim deed purporting to convey WETCO 4th St CR 29 CR 40 LLC's right, title, and interest in the 85/40 Gilcrest Plaza Project property as well as the additional seventy-six acres of farmland to Schell's company, Overlook Holdings LLC ("Overlook"), in exchange for a payment of $1,000,070." In support of this contention, the Plaintiffs cite RFA No. 18 and Exhibit 6 to the MSJ.

RFA No. 18 requests that the Defendant "Admit that on October 7, 2024, You executed a forged quitclaim deed purporting to convey all of WETCO 4th St CR 29 CR 40 LLC's right, title, and interest in the 85/40 Gilcrest Plaza Project, as well as 76 additional acres of farmland, to Overlook in exchange for a payment of $1,000,070." (MSJ Ex. 1 at 9.) Meanwhile, Exhibit 6 to the MSJ is a copy of a document entitled "Quitclaim Deed." (Ex. 6, the "Quitclaim Deed.") The second page of the document states that "Grantor has executed this Quitclaim Deed on October 7, 2024" and appears to be signed by Manuel Agripino, as "Manager" of WETCO 4th St CR 29 CR 40 LLC. Meanwhile, the document includes the following notary certification:


State of Colorado
County of Weld } ss.

The foregoing instrument was acknowledged before me this 27th day of May, 20 25, by Manuel Agripino, MANAGER.
(if by natural person or persons, insert name or names; if by person acting in representative or official capacity or as attorney-in-fact, insert name of person as executor, attorney-in-fact, or other capacity or description; if by officer of corporation, insert name of such officer or officers as the president or other officers of such corporation, naming it). If acknowledgment is taken by a notary public, the date of expiration of his commission shall also appear on the certificate.

Witness my hand and official seal.

IRVIN ORNELAS ARREOLA
NOTARY PUBLIC - STATE OF COLORADO
NOTARY ID 20224046938
MY COMMISSION EXPIRES DEC 14, 2026

Notary Public

My commission expires: Dec. 14, 2026

The document is internally inconsistent, as it indicates both that the document was "executed" on October 7, 2024, and was "acknowledged" (in order words, executed) before a notary public on May 27, 2025. Under the circumstances, the Court

the Court includes Alleged Undisputed Fact No. 119 in the category of facts undisputed for purposes of summary judgment .

finds that there exists a question of fact on the issue of when it was that Mr. Agripino actually executed the quitclaim deed. The Court cannot find an absence of any dispute of fact with respect to Alleged Undisputed Fact No. 57.

In addition, the Plaintiffs assert in Alleged Undisputed Fact No. 116 that it is undisputed that: "On October 7, 2024, the Debtor fraudulently conveyed the WETCO 4th St CR 29 CR 40 LLC property to Schell's company, Overlook." In support of that contention, which calls for a legal conclusion, the Plaintiffs cite RFA No. 70. RFA No. 70 states: "Admit that You fraudulently conveyed the WETCO 4th St CR 29 CR 40 LLC property to Schell's company, Overlook, on October 7, 2025." First, RFA No. 70 does not admit that anything occurred on October 7, *2024*, since the date in RFA No. 70 is "October 7, *2025*." But secondly, and more importantly, whether a conveyance occurred is an issue that must be determined with reference to the document that allegedly effected the conveyance: the Quitclaim Deed. Since there exists a question of fact as to when that document was executed, the Court cannot find that Alleged Undisputed Fact No. 116 is undisputed for purposes of summary judgment.

## C. <u>Many of the Alleged Undisputed Facts the Defendant Disputes on the Basis of Lack of Evidence are Supported and are Undisputed for Summary Judgment Purposes.</u>

In the MSJ Response, the Defendant disputes Alleged Undisputed Facts Nos. 7, 8, 9, 12, 13, 20, 26, 29, 33, 35, 36, and 38 can be deemed undisputed, arguing:

> "**No citation to any evidence is given.** L.B.R. 7056-1(c) requires that each statement of material fact 'be followed by citation to admissible evidence.' The burden of production never shifted as to this statement."

(MSJ Response at 5-31, bolding in original.)

Having reviewed the MSJ carefully, the Court cannot agree with this contention. The Plaintiffs cite evidence in support of each and every one of the foregoing Alleged Undisputed Facts. The evidence cited *does support* Alleged Undisputed Facts Nos. 7, 8, 12, 13, 20, 26, 29, 33, 35, 36, and 38.[10] And, the Defendant does not cite any contravening evidence. Thus, the Court determines that each of the foregoing Alleged Undisputed Facts is, in fact, undisputed for purposes of summary judgment.

---

[10] In addition to objecting that the Plaintiffs did not support Alleged Undisputed Fact No. 38 with citation to evidence, the Defendant also disputes the Alleged Undisputed Fact because: "The underlying request also misidentifies the project: it refers to the '85/40 Gilcrest Plaza Project while the surrounding requests concern WETCO Solar." Alleged Undisputed Fact No. 38 states: "The Debtor also prepared quitclaim deeds purporting to transfer Western Equipment's right, title, and interest in real property to the forty-seven new limited liability companies." The Plaintiff cites RFA No. 14; Amended Complaint ¶ 36; and Answer ¶ 36 in support of this Alleged Undisputed Fact, and such evidence supports the Alleged Undisputed Fact. Thus, the Court cannot find any merit in the Defendant's disputation of such Alleged Undisputed Fact No. 38.

The Court cannot make the same determination with respect to Alleged Undisputed Fact No. 9, which states: "The Debtor owns MelMan Environmental and conducts all the business affairs." In support of Alleged Undisputed Fact No. 9 the Plaintiffs cite portions of Exhibits 2, 3, and 9. Having reviewed the cited evidence, the Court finds that Exhibits 2 and 3 indicate that *Melissa Agrippino*, rather than the Defendant, owns MelMan Environmental. (MSJ Ex. 2 ¶ 22; Ex. 3 ¶ 22.) Meanwhile, Exhibit 21 indicates that the *Defendant* owns MelMan Environmental. (MSJ Ex. 21 ¶ 5.) All the exhibits support the contention that the Defendant conducts the business affairs of MelMan Environmental, so the Court finds that portion of Undisputed Fact No. 9 to be undisputed for purposes of summary judgment. However, the Court cannot find that it is undisputed that "The Debtor owns MelMan Environmental."

### D. <u>Many of the Facts the Defendant Disputes are Supported and are Undisputed for Summary Judgment Purposes.</u>

In the MSJ Response, the Defendant responded "Admitted in part" with respect to Alleged Undisputed Facts Nos. 2, 11, 14, 15, 24, 25, 27, 42, 48, 50, 51, 53, 55, 56, 62, 73, and 93-101. By so doing, the Defendant generally failed to identify with precision which portions of the foregoing Alleged Undisputed Facts he denies. Instead, to some Alleged Undisputed Facts, the Defendant responds: "Admitted in Part. "Answer ¶ [ ] admits the allegations of Amended Complaint ¶ [ ]." To others, he responds: "Admitted only that [ . . .]." In all such cases, the Defendant leaves it to the Court to ferret out what it is that was stated in the Amended Complaint and Answer and to ascertain how, if at all, the Alleged Undisputed Fact differs from whatever it was that the Defendant admitted in the Answer. This is not proper practice and is burdensome to the Court.

Nevertheless, having reviewed the foregoing Alleged Undisputed Facts, along with the evidence cited by both parties including Exhibit 2 (the Amended Complaint), Exhibit 3 (the Answer), and Exhibit 4 (the "Affidavit of Craig Sparrow" (the "Sparrow Affidavit")), the Court finds that the following Alleged Undisputed Facts are undisputed in their entirety for purposes of summary judgment: Nos. 11,[11] 14,[12] 15,[13] 24,[14] 25 and

---

[11] Paragraph 4 of the Sparrow Affidavit is admissible evidence on this point and supports Alleged Undisputed Fact No. 11. Answer ¶ 14 does not contravene any portion of Alleged Undisputed Fact No. 11 or Sparrow Affidavit ¶ 4. And the Plaintiff has offered no other evidence in contravention of any portion of Alleged Undisputed Fact No. 11. The Court does note that the Defendant admitted that he "held himself out as an *environmental* expert" as opposed to an "environment expert".

[12] Amended Complaint ¶ 27 and Answer ¶ 27 support Alleged Undisputed Fact No. 14 in its entirety as the Debtor admitted the allegation in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of Alleged Undisputed Fact No. 14. The Defendant should have admitted that the Alleged Undisputed Fact was undisputed.

[13] The Court recognizes that Amended Complaint ¶ 28 and Answer ¶ 28 contain slightly different language than the language of Undisputed Fact No. 15. However, they still support Alleged Undisputed Fact No. 15, as the Defendant states in Answer ¶ 28: "In approximately March 2024, the Sparrows offered Defendant an opportunity to partner with Western Equipment concerning the Hydrovac Water Dump Site business."

[14] Amended Complaint ¶ 33 and Answer ¶ 33 support Alleged Undisputed Fact No. 24 in its entirety as the Debtor admitted the allegation in the Amended Complaint in his Answer. The Court cannot find a

27,[15] 42,[16] 50 and 51,[17] 53,[18] 55[19], 56[20], 62,[21] 73,[22] 93-98,[23] and 99-101.[24] The Court finds that Alleged Undisputed Fact No. 2 is undisputed to the extent that it states. "The Sparrows are husband and wife." It is otherwise disputed.[25]

---

basis for only partial admission of Alleged Undisputed Fact No. 24. The Defendant should have admitted that the Alleged Undisputed Fact was undisputed.

[15] Amended Complaint ¶ 38 and Answer ¶ 38 support Alleged Undisputed Facts Nos. 25 and 27 in their entirety as the Debtor admitted the allegations in the Amended Complaint in his Answer. Exhibit 5 to the MSJ supports Alleged Undisputed Fact No. 25. The Court cannot find a basis for only partial admission of Alleged Undisputed Fact Nos. 25 and 27. The Defendant should have admitted that the Alleged Undisputed Facts were undisputed.

[16] Amended Complaint ¶ 37 and Answer ¶ 38 support Alleged Undisputed Fact No. 42 in its entirety as the Debtor admitted the allegation in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of Alleged Undisputed Fact No. 42. The Defendant should have admitted that the Alleged Undisputed Fact was undisputed.

[17] Amended Complaint ¶ 45 and Answer ¶ 45 support Alleged Undisputed Facts Nos. 50 and 51 in their entirety as the Debtor admitted the allegations in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of Alleged Undisputed Facts Nos. 50 and 51. The Defendant should have admitted that the Alleged Undisputed Facts were undisputed.

[18] Amended Complaint ¶ 47 and Answer ¶ 47 support Alleged Undisputed Fact No. 53 in its entirety as the Debtor admitted the allegation in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of Alleged Undisputed Fact No. 53. The Defendant should have admitted that the Alleged Undisputed Fact was undisputed.

[19] Amended Complaint ¶ 48 and Answer ¶ 48 support Alleged Undisputed Fact No. 55 in its entirety as the Debtor admitted the allegation in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of Alleged Undisputed Fact No. 55. The Defendant should have admitted that the Alleged Undisputed Fact was undisputed.

[20] Amended Complaint ¶ 48 and Answer ¶ 48 support Alleged Undisputed Fact No. 56 in its entirety as the Debtor admitted the allegation in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of Alleged Undisputed Fact No. 56. The Defendant should have admitted that the Alleged Undisputed Fact was undisputed.

[21] The Court recognizes that Amended Complaint ¶ 51 and Answer ¶ 51 contain slightly different language than the language of Undisputed Fact No. 62. However, they still support Alleged Undisputed Fact No. 62, as the Defendant states in Answer ¶ 51: "The Court recognizes that Amended Complaint ¶ 28 and Answer ¶ 28 contain slightly different language than the language of Undisputed Fact No. 62. However, they still support Alleged Undisputed Fact No. 62, as the Defendant states in Answer ¶ 51: "Defendant admits that Spruance Consulting LLC was engaged to provide land use entitlements work for the contemplated sale [of the five acres from the 85/40 Gilcrest Plaza Project property]." And, the Defendant did not cite to admissible evidence contesting any of the allegations in Undisputed Fact No. 62.

[22] Amended Complaint ¶ 53 and Answer ¶ 53 support Alleged Undisputed Fact No. 73 in its entirety as the Debtor admitted the allegation in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of Alleged Undisputed Fact No. 73. The Defendant should have admitted that the Alleged Undisputed Fact was undisputed.

[23] Amended Complaint ¶ 48 and Answer ¶ 48 support Alleged Undisputed Facts Nos. 93 through 98 in their entirety as the Debtor admitted the allegations in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of any of Alleged Undisputed Facts No. 93 through 98. The Defendant should have admitted that such Alleged Undisputed Facts were undisputed.

[24] Amended Complaint ¶ 52 and Answer ¶ 52 support Alleged Undisputed Facts Nos. 99 through 101 in their entirety as the Debtor admitted the allegations in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of any of Alleged Undisputed Facts No. 99 through 101. The Defendant should have admitted that such Alleged Undisputed Facts were undisputed.

[25] Amended Complaint ¶ 12 and Answer ¶ 12 support this portion of Alleged Undisputed Fact No. 1. It is disputed that the Sparrows are creditors of the Debtor. And, whether the Sparrows are creditors of

In the MSJ Response, the Defendant responded "Disputed" with respect to Alleged Undisputed Fact No. 52, which states: "The Debtor told the Sparrows that he could obtain approval of the 85/40 Gilcrest Plaza Project subdivision application approved by the Town of Gilcrest quickly because of his influence with the town board and because the town needed growth and funding for the school board." However, like many of the Alleged Undisputed Facts that the Defendant "Admitted in part," Alleged Undisputed Fact No. 52 is supported by the evidence cited.[26] The Defendant has not offered any evidence that contravenes Alleged Undisputed Fact No. 52. As such, the Court finds that Alleged Undisputed Fact No. 52 is undisputed in its entirety for purposes of summary judgment.

The Court also does not find that Alleged Undisputed Fact No. 48 is supported by the evidence. Plaintiffs assert in Alleged Undisputed Fact No. 48 that it is undisputed that: "Craig told Schell he would contact the Defendant to determine what he could develop on the five acres." In Answer ¶ 4, the Defendant admits that "Craig Sparrow directed Kenneth Schell to contact Defendant regarding development and land sale possibilities."[27] It may be a fine point, but, on the one hand, Alleged Undisputed Fact No. 48 could be interpreted to mean: "Craig told Schell [that Craig] *would* contact the Debtor . . ." and on the other it could be interpreted to mean: "Craig told Schell [that Shell] *could* contact the Debtor." In neither case could the Court interpret the statement to mean: "Craig *directed* Schell to contact the Debtor." In any event, the Court cannot find an absence of any dispute of fact with respect to Alleged Undisputed Fact No. 48.

## E. <u>Some Alleged Undisputed Facts Are Not Supported</u>.

### 1. <u>The Sparrow Affidavit Does Not Include Statements that Support Certain Alleged Undisputed Facts</u>.

In the MSJ Response, the Defendant asserts that the evidence cited in support of Alleged Undisputed Facts Nos. 49, 109-111, 114, 117, and 118 (namely, paragraphs 16, 18-20, 23, 25 and 26 of the Sparrow Affidavit) does not exist such that these facts are "Disputed". The Court agrees: The Sparrow Affidavit contains only 15 paragraphs, none of which support Alleged Undisputed Facts Nos. 49, 109-111, 117, and 118. Therefore, there exist genuine issues of material fact with respect to Alleged Undisputed Facts Nos. 49, 109-111, 114, 117, and 118.

---

the Debtor is not just a fact – it is also a legal conclusion. So, the Court cannot treat the statement as an undisputed fact for purpose of summary judgment.

[26] Amended Complaint ¶ 46 and Answer ¶ 46 support Alleged Undisputed Fact No. 52 in its entirety as the Debtor admitted the allegation in the Amended Complaint in his Answer. The Court cannot find a basis for only partial admission of Alleged Undisputed Fact No. 52. The Defendant should have admitted that the Alleged Undisputed Fact was undisputed.

[27] The Plaintiff also cites Sparrow Affidavit ¶ 15 in support of Alleged Undisputed Fact No. 48. But Sparrow Affidavit ¶ 15 states: "I have read the motion for Summary Judgment; it is true and correct and the damages calculations are correct regarding our claim for violation of the Colorado Trust Fund Statute." Sparrow Affidavit ¶ 15 does not support the Alleged Undisputed Fact at all.

**2. Alleged Undisputed Facts Nos. 135 and 139 Are Not Supported or Are Not Statements of Fact.**

In Alleged Undisputed Fact No. 135, the Plaintiffs assert: "On February 20, 2026, the Debtor filed his Answer to the Amended Complaint." This is incorrect. The Defendant filed the Answer on March 3, 2026 (Docket No. 12. *See also* MSJ Ex. 3). The Court takes judicial notice of this fact pursuant to Fed. R. Evid. 201.

In Alleged Undisputed Fact No. 139, the Plaintiffs assert: "Pursuant to Fed. R. Civ. P. 36(a)(3), incorporated herein pursuant to Fed. R. Bankr. P. 7036, all requests for admission not answered are deemed admitted." This statement is not a statement of fact, but rather a legal conclusion, which, following the Court's ruling on the Motion to Withdraw Admissions, is accurate.

**3. The Sparrow Affidavit is Not Competent Evidence of Causation of Damages Nor of the Amount of Claimed Damages.**

In Undisputed Fact No. 128, the Plaintiffs assert:

> d. On May 27, 2025, the Debtor notarized his signature on the forged quitclaim to Overlook falsely representing himself to be the "Manager" of WETCO 4th St CR 29 CR 40 LLC, which purportedly had been previously executed on October 7, 2024. . . .
> i. The Debtor was never the "Manager" of WETCO 4th St CR 29 CR 40 LLC. . . .
> ii. The Debtor never had authority to quitclaim the WETCO 4th St CR 29 CR 40 LLC property to Overlook. . . .
> iii. The Debtor recorded a forged quitclaim deed from with WETCO 4th St CR 29 CR 40 LLC to Overlook with the Weld County Clerk and Recorder, as Recording No. 5031496, stating that the Debtor is the "Manager" of WETCO 4th St CR 29 CR 40 LLC. . . .
> iv. The Debtor forged the quitclaim deed from WETCO 4th St CR 29 CR 40 LLC to Overlook for the WETCO 4th St CR 29 CR 40 LLC property. . . .

(Docket No. 32 at 19.) The Plaintiffs also assert: "On October 4, 2024, WETCO 4th St CR 29 CR 40 LLC entered into a Contract to Buy and Sell Real Estate (Land) as seller with Pocket Change Properties II, LLC as buyer to sell land owned by WETCO 4th St CR 29 CR 40 LLC for a sale price of $1,800,000." (No. 129.) And they assert: "On April 28, 2026, buyer Pocket Change Properties II, LLC terminated the Contract to Buy and Sell Real Estate (Land) because clouded title could not be cleared timely." As discussed above, subparagraph d of Alleged Undisputed Fact No. 128 cannot be found

to be undisputed for purposes of summary judgment. However, the Court finds that the facts in subparagraphs i-iv of subparagraph d of Undisputed Fact No. 128 are undisputed.

Then, in Alleged Undisputed Fact No. 131, the Plaintiffs assert that the following statement is undisputed: "The cloud on title and thus the loss of the sale and the $1,800,000 arose from the forged quitclaim for Overlook." The Plaintiffs cite paragraph 14 of the Sparrow Affidavit in support of Alleged Undisputed Fact No. 131. In that paragraph, Sparrow states: "The cloud on title and thus the loss of the sale and the $1,800,000 arose from the forged quitclaim for Overlook executed by the Debtor."

The Defendant disputes Alleged Undisputed Fact No. 131, stating:

> Disputed. This is the sole causation statement supporting 96% of Plaintiffs' claimed damages, and it rests entirely on Exhibit 4, ¶ 14 — a single sentence of pure conclusion: "The cloud on title and thus the loss of the sale and the $1,800,000 arose from the forged quitclaim to Overlook executed by the Debtor." The affidavit offers no valuation evidence, no market evidence, no explanation of why title could not be cleared during the eleven months between the May 27, 2025 recording and the April 30, 2026 closing deadline, and no accounting of any effort to clear it. A conclusory affidavit does not satisfy L.B.R. 7056-1(c) or Fed. R. Civ. P. 56(c)(4). Moreover, by Plaintiffs' own account the cloud arises from an instrument recorded six days after the petition date. Answer ¶ 61(d).

(MSJ Response at 30.)

The Court agrees with the Defendant that the statement in paragraph 14 of the Sparrow Affidavit is conclusory. Assuming that the Defendant's fraud caused WETCO 4th St CR 29 CR 40 LLC to lose the $1,800,000 sale of its land, WETCO 4th St CR 29 CR 40 LLC's damages would be measured by the amount necessary to make it whole, as opposed to the contract price agreed to in the contract with Pocket Change Properties II, LLC. *See Kroesen v. Shenandoah Homeowners Assoc., Inc.,* 461 P.3d 672, 682-83 (Colo. Ct. App. 2020) (determining that lost profits are not a proper measure of damages arising from loss of contract of sale of a property and affirming district court's ruling awarding damages for costs of maintaining a property between the time that sale was lost and the time that property would likely be sold to another party because court recognized that the property still had market value and would likely eventually be sold such that the sellers would recover some amount). Further, as Plaintiffs assert, Mr. Sparrow is not an expert competent to opine on the amount of WETCO 4th St CR 29 CR 40 LLC's damages arising from such lost sale (though he could testify regarding damages, if any, arising from efforts to clear title). As such, the Court finds that the Plaintiffs have not met the burden of production with respect to

Alleged Undisputed Fact No. 131. Alleged Undisputed Fact No. 131 is not established for purposes of summary judgment.

### F. Conclusions Regarding Disputes of Fact.

In summary, and despite the fact that the Defendant disputed or admitted in part only a very few Alleged Undisputed Facts, the Court finds that the vast majority of the Alleged Undisputed Facts – namely, the Alleged Undisputed Facts Nos. 1, 3-8, 9, 10-47, 50-108, 112, 113, 115-130, 132-134, and 136-137 are undisputed. The Court also finds that it is undisputed that "Sparrow are husband and wife" per Alleged Undisputed Fact No. 2 and that the Defendant "conducts all the business affairs [of MelMan Environmental]" per Alleged Undisputed Fact No. 9. So, there is no genuine issue of material fact with respect to any of the foregoing Alleged Undisputed Facts (collectively, the Court refers Alleged Undisputed Facts Nos. 1, 2 (undisputed portion only) 3-47, 50-56, 58108, 112, 113, 115, 117-127, 129-130, 132-134, and 136-137. And there is no genuine issue of material fact with respect to Alleged Undisputed Fact No. 128, except with respect to subparagraph d of Alleged Undisputed Facts No. 128. The Court will refer to the foregoing as the "Undisputed Facts as Determined by the Court."

The Court also finds that the Plaintiff failed to establish the absence of genuine material fact with respect to only Alleged Undisputed Facts Nos. 48, 49, 57, 109-111, 114, 116 117, 118, and 131, as well as subparagraph d of Alleged Undisputed Facts No. 128. The Court finds that Alleged Undisputed Facts 135 is incorrect. And the Court finds that Alleged Undisputed Fact No. 139 is not really a statement of fact so much as a legal conclusion.

Since there is no genuine issue of fact with respect to any of the Undisputed Facts as Determined by the Court, the Undisputed Facts as Determined by the Court are established for purposes of summary judgment. To conserve space in this Order, such Undisputed Facts as Determined by the Court are listed in **Attachment 1** to this Order and Opinion.

## VIII. The Additional Alleged Undisputed Material Facts.

In the MSJ Response, the Defendant presented a series of 25 alleged additional "disputed material" facts in a section entitled "Statement of Additional Disputed Material Facts." (Docket No. 36 at 31-34.) The Court believes that the Defendant intended to assert that the listed facts are "Undisputed" and will refer to them as the "Additional Alleged Undisputed Material Facts." In the MSJ Reply, the Plaintiffs respond that all such Additional Alleged Undisputed Material Facts are not disputed.[28] Accordingly, the Court determines that Additional Alleged Undisputed Material Facts are also undisputed and established for purposes of summary judgment.

[28] The Defendants also submit with the MSJ Reply a corrected affidavit of Craig Sparrow in support of some of the Alleged Undisputed Facts. The Court will not consider the corrected affidavit at this stage.

To conserve space in this Order, such Additional Undisputed Facts are also listed in **Attachment 1** to this Order and Opinion.

## IX. Applicable Law and Legal Analysis.

### A. The General Framework for Nondischargeability Determinations.

Section 727(b) grants an individual Chapter 7 debtor a discharge "from all debts that arose before the date of the order for relief under this chapter," subject to the exceptions set forth in § 523. To determine whether a debt is nondischargeable under Section 523, bankruptcy courts engage in a two-part analysis. First, "the bankruptcy court must determine the validity of the debt under applicable law . . . ." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016); *see also Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. BAP 2003) (if the alleged debt is for fraud, "state law of fraud controls with respect to whether fraud has occurred"). This is referred to as the "claim on the debt" component. *Thompson*, 555 B.R. at 8. Second, if there is a valid debt, "the bankruptcy court must determine the dischargeability of that debt under Section 523 . . . ." *Id.*; *see also Lang*, 293 B.R. at 513 ("bankruptcy law controls with respect to the determination of nondischargeability"). This is referred to as the "dischargeability" component. *Thompson*, 555 B.R. at 8.

The first part of the dischargeability analysis starts with the Court deciding whether there is a valid debt. *Thompson*, 555 B.R. at 8. The term "debt" is defined in Section 101(12) as "liability on a claim." And, under Section 101(5), a "claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5)(A). In this Adversary Proceeding, the Defendant contests both the validity of the claimed debt — that is, whether the Plaintiffs have established a right to payment — and the nondischargeability of any such debt.

### B. The Plaintiffs Have Not Established Critical Elements of Their Claims.

#### 1. The Amount of the Debt Has Not Been Established.

As set forth above, all three of the Plaintiffs' Section 523(a) claims (523(a)(2)(A), (a)(4), and (a)(6)) require that the Plaintiffs prove the existence and amount of a pre-petition debt. *Thompson*, 555 B.R. at 8. The Plaintiffs ask for a judgment of $1,873,083.60.

But, the Undisputed Facts as Determined by the Court do not conclusively establish the existence and amount of a $1,873,083.60 debt owed to the Plaintiffs by the Defendant that arose prior to the Petition Date.

Turning to the MSJ, the *only* argument concerning the debt and amount thereof is as follows:

> Plaintiffs suffered substantial damages, including over $34,000 paid for ineffective organizational documents and real property transfers, $24,650 paid for fictitious Spruance expenses, and $14,433.60 in connection with the fraudulent Rocky Ridge documents. Exhibit 1, Req. for Admis. Nos. 23, 34, 47–49 & 50–59; Exhibit 2, ¶ 37; Exhibit 3, ¶ 38.
>
> The Debtor's fraudulent conduct also caused substantial damages through his unauthorized transfer of Plaintiffs' real property. The Debtor falsely represented that he possessed authority to act on behalf of WETCO 4th St. CR 29 CR 40 LLC and executed a forged quitclaim deed transferring valuable property to Overlook. Exhibit 1, Req. for Admis. Nos. 18, 70, 99–101. The Debtor falsely identified himself as the entity's manager despite having no ownership or management interest and no authority to convey the property. Exhibit 1, Req. for Admis. Nos. 19–20, 99–100 & 102. The forged WETCO 4th St. CR 29 CR 40 LLC, Western Equipment, or Plaintiffs. Exhibit 1, Req. for Admis. No. 18. *The forged quitclaim to Overlook executed by the Debtor caused WETCO 4th St. CR 29 CR 40 LLC to the loss to Pocket Change Properties, LLC for $1,800,000.*
>
> The Plaintiffs' damages total $1,873,083.60.

(Docket No. 32 at 23-24; emphasis added.) The same mantra was repeated throughout the MSJ. (Docket No. 32 at 28 and 34.)

So, the Plaintiffs assert two general categories of debt: $1,800,000 pertaining to the alleged "quitclaim to Overlook." And $73,083.60 for alleged overpayments for ineffective or fictitious services. The MSJ presents nothing else.

Leaving aside the sentence fragments and grammatical errors in the above-quoted passage from the MSJ, the Court considers the largest alleged debt first: the $1,800,000 for the "forged quitclaim to Overlook". The Quitclaim Deed upon which the Plaintiffs apparently rely was presented as Exhibit 6 to the MSJ. As discussed earlier, there exists a question of fact as to when the Quitclaim Deed was executed – that is, whether it was signed on October 7, 2024, *before* the Petition Date, or whether it was signed on May 27, 2025, *after* the Petition Date.

Since it is not clear when the alleged misconduct related to the Quitclaim Deed occurred,[29] the Court cannot determine, based on the evidence, whether the

---

[29] Even if the Defendant signed the Quitclaim Deed on October 7, 2024, the Court does not understand how a "cloud on title" could have occurred until the Quitclaim Deed was filed in the real property records of Adams County, Colorado, on May 27, 2025 (which date is after the Petition Date).

misconduct gave rise to a pre-petition debt. If the debt arose pre-petition, then the Court will need to consider whether any debt arising from the transaction effected by the Quitclaim Deed is nondischargeable under Section 523(a), but, if it not, there will be no need for the Court to do so because post-petition debts are not discharged in Chapter 7 cases. But, even if the debt arose pre-petition, none of the Undisputed Facts as Determined by the Court definitively establish the amount of such debt as being $1,800,000.

Given the foregoing failure with respect to a key part of the Plaintiffs' case — proving the "claim on the debt" component per *Thompson*, 555 B.R. at 8 — the Court cannot grant summary judgment in favor of the Plaintiffs on the lion's share ($1,800,000) of its claims.

The Plaintiffs fare a little better regarding the $73,083.60 for alleged overpayments for ineffective or fictitious services. Those amounts at least appear in the Undisputed Facts as Determined by the Court. However, the Plaintiffs failed on their summary judgment burden with respect to other components of the claims for recovery of $73,083.60, as discussed more fully below.

**2. <u>The Plaintiffs Have Not Shown Justifiable Reliance in Support of their Section 523(a)(2) Claim</u>.**

With respect to the Section 523(a)(2)(A) claim (for the $73,083.60 debt), Section 523(a)(2)(A) requires, as its fourth element, that the Plaintiffs also show that their reliance was justifiable. In *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996), the Tenth Circuit indicated that the reliance must be "reasonable." However, the appellate courts later clarified that the reliance must be "justifiable." *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009); *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Reasonable reliance and justifiable reliance are slightly different. Reasonable reliance is an objective standard based upon whether a reasonable person would have relied on the alleged false representations. Justifiable reliance is a "less demanding [standard]" than reasonable reliance. *Field*, 516 U.S. at 61; *see also Wagner v. Wagner (In re Wagner)*, 492 B.R. 43, 52 (Bankr. D. Colo. 2013), *aff'd*, 527 B.R. 416 (10th Cir. BAP 2015) ("Justifiable reliance is not a high standard."); Richard Levin & Henry J. Sommer, 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][d] (Matthew Bender 16th ed. Supp. 2020) (justifiable reliance is "a less exacting standard" than reasonable reliance). Instead of an objective standard, justifiable reliance is a subjective standard that focuses on the "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases." *Riebesell,* 586 F.3d at 792; *see also Wharton v. Flanagan (In re Flanagan)*, 2014 WL 3932647, at *7 (Bankr. D. Colo. 2014) (noting difference between "reasonable reliance" and "justifiable reliance"). Under the "justifiable" reliance test, "the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it." *Riebesell,* 586 F.3d at 792 (quoting *Field*, 516 U.S. at 71). Put another way:

> In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent. . . . Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover.

*Adams Cnty. Dept. Soc. Servs. v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354 n.2 (Bankr. D. Colo. 2006) (citations to *Field* omitted); *see also Chong*, 523 B.R. at 245 (same). But, the Undisputed Facts as Determined by the Court simply do not meet the Plaintiffs' burden to prove justifiable reliance under summary judgment standards. The Plaintiffs did not show that they "use[d] [their] senses" and at least made "a cursory examination or investigation" of the facts of the transaction[s] before entering into [them]." So, the Court cannot enter summary judgment under Section 523(a)(2)(A) for the alleged $73,083.60 debt.

### 3. <u>The Plaintiffs Have Not Shown Entrustment in Support of their Embezzlement Claim Under Section 523(a)(4), and Have Not Proved Damages in the Amount Asserted</u>.

With respect to the Section 523(a)(4) claim, the Plaintiffs contend that the debt allegedly owed to them by the Defendant is nondischargeable as a debt for embezzlement or larceny. With respect to the "embezzlement" component of the claim, they argue:

> [T]he Debtor embezzled Plaintiffs' property by fraudulently appropriating funds entrusted to him for legitimate business purposes . . . The Sparrows entrusted the Debtor with access to their business affairs and real property for the limited purpose of assisting with legitimate business and environmental matters. Specifically, the Sparrows allowed the Debtor to act on their behalf to form the forty-seven individual limited liability companies for their property. Exhibit 1, Req. for Admis. Nos. 5 & 9. The Debtor accepted this responsibility and was entrusted with control over the Sparrows' business matters. Exhibit 1, Req. for Admis. Nos. 10–11. The Debtor then exceeded the limited authority granted to him by the Sparrows by fraudulently conveying valuable real property owned by entities controlled by the Sparrows. On October 7, 2024, the Debtor executed a forged quitclaim deed purporting to transfer all of WETCO 4th St. CR 29 CR 40 LLC's interest in the 85/40 Gilcrest Plaza Project property and an additional seventy-six acres of farmland to Overlook, a company owned by Schell. Exhibit 1,

> Req. for Admis. No. 18. The purported $1,000,070 payment for the property was never provided to WETCO 4th St CR 29 CR 40 LLC, Western Equipment, or the Sparrows. Exhibit 1, Req. for Admis. No. 21.

(Docket No. 32 at 32.)

As the Plaintiffs acknowledge, embezzlement means "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Kim v. Sung (In re Sun)*, 535 B.R. 358 ,367 (10th Cir. BAP 2015) (quoting *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir. 1988). The definition of "embezzlement" breaks down into five elements: (1) entrustment (property lawfully obtained originally); (2) of property; (3) of another; (4) that is misappropriated (used or consumed for a purpose other than that for which it was entrusted); with fraudulent intent. *Alternity Cap. Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321, 325 (Bankr. D. Colo. 2013) (quoting *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002)).

The general thrust of the Plaintiff's claim is that they authorized and trusted the Defendant to create the forty-seven limited liability companies, but they did not actually give him authority to convey real property as part of this authority – that is, that they did not "entrust" him with the property they claim was misappropriated. The Undisputed Facts as Determined by the Court do not support such entrustment. As such, the Court cannot determine that Plaintiffs have met the "entrustment" element of the embezzlement claim.[30]

Further, with respect to the Section 523(a)(4) claim, and though the Undisputed Facts as Determined by the Court might possibly suffice to establish a claim that the Defendant committed larceny with respect to the "$34,000 paid for ineffective organizational documents and real property transfers, $24,650 paid for fictitious Spruance expenses, and $14,433.60 in connection with the fraudulent Rocky Ridge documents," nothing in the text of the MSJ asserts that the Section 523(a)(4) claim is directed at the $73,083.60 debt. (Docket No. 32 at 32-33.) Instead, the Plaintiffs' argument in the portion of the MSJ directed to their Section 523(a)(4) claim seems to focus exclusively on damages arising from the fraudulent Quitclaim Deed. The Court will not supply an argument that the Plaintiffs did not make. But also, more importantly, the assertion that the Debtor signed the Quitclaim Deed on October 7, 2024, is not undisputed because there is a key question of fact raised by the Quitclaim Deed itself. So, as set forth above, summary judgment cannot enter.

---

30 The Court does not view "entrustment" of "access" to business affairs and real property as "entrustment" of property for purposes of this claim.

### 4. <u>The Issue of Intent Under Section 523(a)(6) Must Be Decided After Trial</u>.

Finally, with respect to the Section 523(a)(6) claim, Section 523(a)(6) makes nondischargeable any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." As the text of the statute makes plain, nondischargeability under Section 523(a)(6) requires both a "willful injury" and a "malicious injury." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both* [willful and malicious injury], an objection to discharge under [Section 523(a)(6)] must fail.") (emphasis in original); *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 2022 WL 2679049, at *7 (10th Cir. Jul. 12, 2022) (unpublished) ("to determine nondischargeability under § 523(a)(6) we must review whether Mr. Bloom caused both a willful and malicious injury"). Stated differently, Section 523(a)(6) "requires proof of two distinct elements — the injury must be both 'willful' *and* 'malicious.' Analyzing and applying 'willful' and 'malicious' separately is the better approach." *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (10th Cir. BAP 2020) (emphasis in original). According to the Supreme Court, to satisfy the willful injury part of Section 523(a)(6), the Plaintiffs must prove "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). The focus is whether a debtor acted with the "actual intent to cause injury." *Id.* "Willful" injury is a higher standard than "'reckless' or 'negligent'" injury. *Id.* Thus, "debts arising [merely] from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id*. at 64. Explaining further, the Supreme Court observed that:

> [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require the actor to intend "the *consequences* of an act," not simply "the act itself."

*Id*. at 61-62 (emphasis in original, citation omitted). To establish a willful injury, a creditor may use "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or . . . indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur." *Smith*, 618 B.R. at 912. *See also Moore,* 357 F.3d at 1129 ("to constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it'") (brackets and ellipses in original, citation omitted); *Cocoma v. Nigam (In re Nigam)*, 780 Fed. Appx. 559, 563 (10th Cir. 2019) (unpublished table decision) (reaffirming *Moore* formulation of willful injury); *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, at *3 (10th Cir. 2020) (unpublished) ("§ 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur"). It is a subjective standard. *Smith*, 618 B.R. at 912.

Here, though the Undisputed Facts as Determined by the Court are some evidence that the Defendant intended to harm the Plaintiffs or cause them injury, the Court believes the issue is one that would be better decided after consideration of witness testimony at trial. As such, the Court will reserve judgment on the issue of intent until after at trial. After all, intent is notoriously difficult to prove on summary judgment. *See Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir. 1977) (noting that summary judgment is not ordinarily a proper vehicle for the court to resolve a dispute concerning state of mind and intent); *see also Darjean v. Sanders (In re Sanders)*, 2026 WL 237133, at * 1 (Bankr. D. Colo. Jan. 27, 2026) ("Questions involving a defendants' intent or state of mind are generally not susceptible to summary judgment.").

## X. <u>Orders</u>.

For the foregoing reasons, the Court ORDERS as follows:

1. The Motion to Withdraw Admissions (Docket No. 37) is DENIED. Pursuant to Fed. R. Bankr. P. 36(a)(3), all of Plaintiff's RFAs Nos. 1-105 (Docket No. 32, Ex 1. at 7-16) are deemed admitted and are conclusively established in this Adversary Proceeding.

2. The MSJ (Docket No. 32) is DENIED pursuant to Fed. R. 56(a).

3. Trial will proceed as scheduled, commencing on **November 9, 2026**.

DATED this 28th day of October, 2026.

BY THE COURT:

Thomas B. McNamara
United States Bankruptcy Judge

ATTACHMENT 1

**Undisputed Facts as Determined by the Court**

1. The Debtor,[1] Manuel Agripino (the "Debtor") and Melissa Agripino, also known as Melissa Wuethrich ("Mrs. Agripino") (collectively, the "Agripinos") are husband and wife.

2. Two of the Plaintiffs,[2] Craig Sparrow and Sharon Sparrows (collectively, the "Sparrows") are husband and wife.

3. On April 1, 2023, the Debtor and Mrs. Agripino transferred title of their personal residence located at 815 Starbird Avenue, Gilcrest, Colorado 80623 (the "Starbird Residence") via quitclaim deed into MelMan Trust LLC.

4. At the time the Starbird Residence was transferred, MelMan Trust LLC did not exist.

5. The transfer of the Starbird Residence occurred to hinder, delay, or defraud the Debtor's creditors.

6. On August 15, 2024, articles of organization for MelMan Trust LLC were filed with the Colorado Secretary of State by Mrs. Agripino.

7. On December 6, 2022, the Agripinos filed articles of incorporation with the Colorado Secretary of State for Melman Environmental Corporation, LLC ("MelMan Environmental").

8. The Agripinos formed MelMan Environmental as part of a scheme to defraud Plaintiffs.

9. The Debtor . . . conducts all the business affairs [of MelMan Environmental].

10. Western Equipment & Truck, Inc. ("Western Equipment") is a Colorado corporation owned equally by the Sparrows and Craig's brother, Brian Sparrow.

11. In August 2022, the Sparrows began a professional relationship with the Debtor, during which the Debtor held himself out as an environment expert.

---

[1] The Court generally refers to the Debtor, Manuel Agripino, as the "Defendant" in the "Order Denying Motion to Withdraw Deemed Admissions, Denying Summary Judgment, and Deeming Facts Established Pursuant to Fed. R. Civ. P. 56(g)." For purposes of the Motion itself and this Attachment 1, the terms "Debtor" and "Defendant" both refer to Manuel Agripino.

[2] Craig Sparrow, Sharon Sparrow, WETCO 1100 N ETHEL AVE, LLC, WETCO 4th ST CR 29 CR 40 LLC, WETCO SOLAR FARM LLC, and Western Equipment & Truck, Inc. (all together, the "Plaintiffs") are all plaintiffs in *Sparrow et al v. Agripino (In re Agripino)*, Adv. Pro. No. 26-1025-TBM (Bankr. D. Colo.) (the "Adversary Proceeding").

12. Western Equipment owns property located at County Road 38½ and Highway 85 in Weld County, Colorado, which it used as a Hydrovac water dump site (the "Hydrovac Site").

13. In March 2024, the Sparrows received a complaint from a neighbor alleging that contaminated materials were being dumped on the Hydrovac Site.

14. The Sparrows contacted the Debtor for assistance in addressing the complaint concerning the Hydrovac Site.

15. On April 1, 2024, the Sparrows, through Western Equipment, entered into an agreement with MelMan Environmental to share the profits and expenses associated with the Hydrovac Site.

16. During the course of the Hydrovac Site agreement, the Debtor sometimes directed Western Equipment to issue checks payable to him in his individual name rather than MelMan Environmental.

17. Western Equipment was subject to an Environmental Protection Agency Consent Decree concerning real property located in Milliken, Colorado, commonly known as "Two Rivers" (the "EPA Controversy").

18. There was also an associated criminal charge brought against Western Equipment brought by the Town of Milliken, Colorado (the "Milliken Controversy").

19. The Consent Decree and criminal charge related to the Sparrows' self-help efforts to remediate flood damage on the Two Rivers property by backfilling, without a required permit, a section of the property that constituted wetlands.

20. As of May 2024, the Sparrows' and Western Equipment's efforts to resolve the EPA and Milliken Controversies had been ongoing for approximately five years.

21. The Sparrows and Western Equipment assembled a team of attorneys and other professionals who worked over the years on a series of remediation plans approved by the EPA and the Town of Milliken.

22. In May 2024, the Sparrows asked the Debtor for advice regarding the EPA and Milliken Controversies.

23. The Debtor told the Sparrows that through his work as an environmental expert and engineer, he knew all of the local EPA representatives, that he had a cousin on the Milliken town board, and that he could get the EPA and Milliken Controversies resolved "in a matter of weeks."

24. Craig Sparrow then informed Western Equipment's team of attorneys and other professionals that they were authorized to discuss all matters concerning the EPA and Milliken Controversies with the Debtor.

25. On August 15, 2024, Western Equipment and MelMan Environmental entered into an independent contractor agreement for the services to be provided on the EPA and Milliken Controversies (the "Independent Contractor Agreement").

26. Accordingly, the Sparrows entrusted the Debtor to take appropriate steps in their best interests and the best interests of Western Equipment concerning the EPA and Milliken Controversies. The Debtor accepted that responsibility.

27. The Debtor recommended that the services he would provide for the Two Rivers remediation work would include removing and replacing fill dirt on the Two Rivers site and providing re-seeding and maintenance work on the wetlands and flood plain.

28. The Debtor was unable to resolve the EPA and Milliken Controversies as he had represented he could to the Sparrows.

29. In July 2024, the Debtor told the Sparrows that they were going to be fined by the EPA since the beginning of the EPA Controversy, would owe the EPA "millions of dollars," and that the EPA was going to seize all of their assets.

30. The Debtor told the Sparrows that they should create limited liability companies into which they should transfer their real property to protect their assets from the EPA

31. The Debtor told the Sparrows that he was knowledgeable and experienced in creating such limited liability companies and transferring real property into those entities.

32. The Debtor offered to prepare and register forty-seven limited liability companies on behalf of the Sparrows and Western Equipment.

33. The Debtor agreed to transfer ownership interests in one or more of Plaintiffs' various real estate holdings to the forty-seven limited liability companies.

34. Between July 22, 2024, and August 7, 2024, the Debtor filed articles of organization with the Colorado Secretary of State on behalf of one or more of Plaintiffs for forty-seven new limited liability companies.

35. The Debtor prepared "articles of incorporation" and "bylaws" for the forty-seven new limited liability companies.

36. In the "articles of incorporation," the Debtor identified Craig, Sharon, and Brian Sparrow as purported equal one-third owners of each of the forty-seven new limited liability companies.

37. The steps the Debtor undertook to create the limited liability companies on behalf of one or more of Plaintiffs were ineffective to create such entities.

38. The Debtor also prepared quitclaim deeds purporting to transfer Western

Equipment's right, title, and interest in real property to the forty-seven new limited liability companies.

39. The Debtor recorded the quitclaim deeds transferring one or more of Plaintiffs' right, title, and interest in the forty-seven new limited liability companies with the clerk and recorder offices in the counties where the properties were located.

40. Multiple quitclaim deeds the Debtor prepared for Plaintiffs in connection with the forty-seven new limited liability companies contained incorrect county designations.

41. Multiple quitclaim deeds the Debtor prepared for Plaintiffs in connection with the forty-seven new limited liability companies contained incorrect legal descriptions.

42. Western Equipment, through its trade name "WE Properties," paid the Debtor as MelMan Environmental approximately $34,000 for his services in preparing and filing the articles of organization with the Colorado Secretary of State, for his preparation and recording of the quitclaim deeds, and for his preparation of the "articles of incorporation" and "bylaws."

43. In May 2024, Kenny Schell ("Schell") came to Western Equipment's offices inquiring whether the Sparrows had any land in the Platteville, Colorado area available for sale for Schell's septic business.

44. Craig Sparrow told Schell that he only had land available for sale in Gilcrest and Kersey, Colorado.

45. Schell inquired about the Gilcrest property. Craig identified the location of the property and proposed selling five acres of the land to Schell for $300,000.

46. The Gilcrest land was owned by Western Equipment and consisted of fifty-nine acres (the "85/40 Gilcrest Plaza Project").

47. Craig Sparrow told Schell he would contact the Debtor to determine what he could develop on the five acres.

48. [OMITTED – not established.]

49. [OMITTED – not established.]

50. Before Schell could buy the five acres of the 85/40 Gilcrest Plaza Project, the property had to be subdivided into separate parcels so the five acres would have its own legal description and could be conveyed.

51. Craig Sparrow had already begun the subdivision application process with the Town of Gilcrest.

52. The Debtor told the Sparrows that he could obtain approval of the 85/40 Gilcrest Plaza Project subdivision application approved by the Town of Gilcrest quickly because of his influence with the town board and because the town needed growth and funding for the school board.

53. Toward the end of June 2024, Craig Sparrow entered into a verbal agreement with the Debtor, acting on his individual behalf or on behalf of his alter egos, MelMan Trust LLC or MelMan Environmental, providing that if the Debtor brought forward a buyer for the 85/40 Gilcrest Plaza Project, then the Debtor would get a 25% commission on the sale price of the lot purchased.

54. The 85/40 Gilcrest Plaza Project property plus an additional seventy-six acres of farmland (the "WETCO Property") had been transferred from Western Equipment via quitclaim to WETCO 4th St CR 29 CR 40 LLC on July 29, 2024, which was a limited liability company for which the Debtor had filed articles of organization on behalf of the Sparrows and Western Equipment.

55. For WETCO 4th St CR 29 CR 40 LLC, the Debtor had also prepared "articles of incorporation" and "bylaws" for execution by the Sparrows.

56. The "articles of incorporation," which were signed by Craig Sparrow, specified that Craig, Sharon, and Brian Sparrow were each one-third owners of WETCO 4th St CR 29 CR 40 LLC.

57. [OMITTED – not established.]

58. In the quitclaim deed, the Debtor falsely represented himself to be the "Manager" of WETCO 4th St CR 29 CR 40 LLC.

59. The Debtor was never a member or manager of WETCO 4th St CR 29 CR 40 LLC.

60. None of the purported $1,000,070 payment was provided to WETCO 4th ST CR 29 CR 40 LLC, to the Sparrows, or to Western Equipment.

61. The 85/40 Gilcrest Plaza Project property and the additional seventy-six acres of farmland were worth substantially more than $1,000,070.

62. Spruance Consulting LLC ("Spruance") was hired by the Debtor, through MelMan Environmental, to provide land use entitlement services for the contemplated sale of the five acres from the 85/40 Gilcrest Plaza Project property.

63. On October 8, 2024, the Debtor presented to the Sparrows an invoice from Spruance for payment of $8,050.

64. The Debtor told the Sparrows that Spruance had performed $8,050 worth of work on the 85/40 Gilcrest Plaza Project property.

65. Spruance did not complete any work on the 85/40 Gilcrest Plaza Project property.

66. When the Debtor told the Sparrows that Spruance had performed $8,050 worth of work on the 85/40 Gilcrest Plaza Project property, the Debtor knew this was false.

67. The Debtor told the Sparrows that MelMan Environmental paid Spruance $8,050 for work completed on the 85/40 Gilcrest Plaza Project property.

68. The Debtor presented the Sparrows with a false MelMan Environmental check in the amount of $8,050 purportedly paid to Spruance for work allegedly completed on the 85/40 Gilcrest Plaza Project property.

69. MelMan Environmental did not pay Spruance any amount for work completed on the 85/40 Gilcrest Plaza Project property.

70. When the Debtor told the Sparrows that MelMan Environmental had paid Spruance $8,050 for work completed on the 85/40 Gilcrest Plaza Project property, he knew this was false.

71. When the Debtor presented the Sparrows with a false MelMan Environmental check in the amount of $8,050 purportedly paid to Spruance for work allegedly completed on the 85/40 Gilcrest Plaza Project property, the Debtor knew the check was fraudulent.

72. Sharon Sparrow reimbursed MelMan Environmental $8,050 for the work purportedly completed by Spruance on the 85/40 Gilcrest Plaza Project property.

73. Rocky Ridge Civil Engineering (“Rocky Ridge”) was the engineering firm hired by Western Equipment to provide civil engineering services on the 85/40 Gilcrest Plaza Project.

74. The Debtor worked with Rocky Ridge as the Sparrows and Western Equipment’s representative on the 85/40 Gilcrest Plaza Project.

75. On November 6, 2024, Rocky Ridge sent a scope of work proposal to the Debtor for services to Western Equipment for a stated total fee of $41,000, which the Debtor approved and signed on behalf of Western Equipment on November 7, 2024.

76. The Debtor never presented Rocky Ridge’s $41,000 scope of work proposal for civil engineering work on the 85/40 Gilcrest Plaza Project to the Sparrows.

77. Instead, the Debtor sent the Sparrows a forged Rocky Ridge scope of work proposal for work to be performed on the 85/40 Gilcrest Plaza Project property.

78. The Rocky Ridge scope of work proposal the Debtor sent to the Sparrows for work to be performed on the 85/40 Gilcrest Plaza Project property was fraudulent.

79. When the Debtor sent the forged Rocky Ridge scope of work proposal to the Sparrows for work to be performed on the 85/40 Gilcrest Plaza Project property instead of the $41,000 proposal produced by Rocky Ridge, the Debtor knew it was forged.

80. The Debtor forged the Rocky Ridge scope of work proposal for work to be performed on the 85/40 Gilcrest Plaza Project property that the Debtor sent to the Sparrows.

81. The Debtor forged the Rocky Ridge scope of work proposal for work to be performed on the 85/40 Gilcrest Plaza Project property that he sent to the Sparrows by changing line-item fees, falsely increasing the total fee to $72,400, and adding a fraudulent $10,860 deposit.

82. The Debtor forged the signature of Rocky Ridge's President, Joel Seamons, on the Rocky Ridge proposal he sent to the Sparrows for work to be completed on the 85/40 Plaza Project property.

83. The Debtor presented the fraudulent Rocky Ridge proposal to Craig Sparrow for work to be completed on the 85/40 Plaza Project property.

84. When the Debtor presented the fraudulent Rocky Ridge work proposal to Craig Sparrow for work to be completed on the 85/40 Plaza Project property, he told Craig that he paid a $10,860 deposit that needed to be reimbursed.

85. The Debtor did not pay a $10,860 deposit to Rocky Ridge for work to be performed on the 85/40 Gilcrest Plaza Project property.

86. WETCO Holdings LLC paid the Debtor $10,860 for reimbursement pursuant to the fraudulent Rock Ridge proposal for the 85/40 Plaza Project property.

87. On January 6, 2025, the Debtor presented the Sparrows with a fraudulent $3,573.60 invoice, dated December 30, 2024, from Rocky Ridge for the work performed on the 85/40 Gilcrest Plaza Project, representing that the invoice was authentic.

88. The Debtor created the forged Rocky Ridge invoice dated December 30, 2024, stating that Rocky Ridge was owed $3,573.60 for work performed on the 85/40 Gilcrest Plaza Project.

89. Rocky Ridge never issued a $3,573.60 invoice dated December 30, 2024, for work performed on the 85/40 Gilcrest Plaza Project.

90. When the Debtor presented the forged $3,573.60 Rocky Ridge invoice, dated December 30, 2024, for work performed on the 85/40 Gilcrest Plaza Project to the Sparrows, the Debtor stated that he had already paid the invoice and needed to be reimbursed for this payment.

91. The Debtor provided the Sparrows with a fraudulent copy of a MelMan Environmental check purporting to represent his payment of the fraudulent $3,573.60

Rocky Ridge invoice for work performed on the 85/40 Gilcrest Plaza Project.

92. Not knowing of the fraud, Sharon Sparrow reimbursed MelMan Environmental $3,573.60 for the fraudulent Rocky Ridge invoice for work performed on the 85/40 Gilcrest Plaza Project.

93. In June 2024, Craig Sparrow entered into another verbal agreement with the Debtor that if he, acting on his individual behalf or on behalf of his alter egos, MelMan Trust LLC or MelMan Environmental, brought forward a buyer for a land development known as "Solar Farm," the Debtor would receive a 25% commission on the sale price of a purchased lot.

94. The "Solar Farm" property had been transferred by quitclaim deed by Western Equipment to WETCO Solar Farm LLC ("WETCO Solar") on July 29, 2024.

95. WETCO Solar was one of the forty-seven new limited liability companies the Debtor formed on the Sparrows' behalf.

96. In addition to filing articles of incorporation with the Colorado Secretary of State for WETCO Solar, the Debtor also prepared the quitclaim deed from Western Equipment to WETCO Solar which Craig signed and Sharon notarized and the Debtor recorded with the Weld County Clerk and Recorder on July 29, 2024.

97. The Debtor also prepared "articles of incorporation" and "bylaws" for WETCO Solar. The "articles of incorporation" were signed by Craig on July 29, 2024, and specified Craig, Sharon, and Brian Sparrow as the equal one-third owners of WETCO Solar.

98. The "bylaws" were signed by the Sparrows on July 29, 2024.

99. In October 2024, the Debtor approached Craig Sparrow and told him he located a manufactured home developer that was interested in buying 12 acres of the WETCO Solar property.

100. At the Debtor's request, Spruance Consulting was engaged to prepare a scope of work for land use entitlement services relating to the WETCO Solar property.

101. Spruance Consulting prepared a scope of work proposal for the WETCO Solar property with a stated fee of $16,600.

102. Spruance did not perform any work on the WETCO Solar property.

103. The Debtor told the Sparrows that Spruance had performed $16,600 worth of work on the WETCO Solar property.

104. When the Debtor told the Sparrows that Spruance had performed $16,600 worth of work on the WETCO Solar property, the Debtor knew that representation was false.

105. The Debtor presented the Sparrows with a false MelMan Environmental check payable to Spruance for $16,600 of work purportedly performed on the WETCO Solar property.

106. When the Debtor presented the Sparrows with the false MelMan Environmental check payable to Spruance for $16,600 of work purportedly performed on the WETCO Solar property, the Debtor knew the check was fraudulent.

107. Without knowing the check was fraudulent, Sharon Sparrow paid MelMan Environmental $16,600 for the work purportedly completed by Spruance on the WETCO Solar property.

108. In April 2025, Craig was driving by the WETCO Property and observed that the Debtor and Schell were unloading chain-link fencing wire onto the property.

109. [OMITTED – not established.]

110. [OMITTED – not established.]

111. [OMITTED – not established.]

112. Craig Sparrow told Schell and the Debtor that fencing could not be erected on the property.

113. The Debtor and Schell agreed to not erect any fencing.

114. [OMITTED – not established.]

115. Nevertheless, the Debtor and Schell erected the fencing and began construction of a building on the WETCO Property.

116. [OMITTED – not established.]

117. [OMITTED – not established.]

118. [OMITTED – not established.]

119. On Monday, May 19, 2025, Craig Sparrow visited with officials of the Town of Gilcrest and discovered, in part, that: (a) no building permit had been issued for the building; (b) the Debtor had represented to the Town officials that he was putting the building up for the Sparrows or Western Equipment; and (c) the Debtor had told them the building "had come in early" and that he was merely "standing the building up so no one would come and steal it." However, Craig Sparrow observed that the building had already been set on foundation, but that no permits had been issued for the foundation work.

120. When the Debtor told Town of Gilcrest officials that the building "had come in early," and he was merely "standing the building up so no one would come and steal

it," this was false.

121. At the time the Debtor made those representations to Town of Gilcrest officials, the buildings foundation had already been completed.

122. The Debtor did not obtain a foundation permit for the building on the WETCO 4th St CR 29 CR 40 LLC property.

123. No permits had been issued for the foundation work when the foundation was laid for the building on the WETCO 4th St CR 29 CR 40 LLC property.

124. The Debtor had the foundation laid for the building on the WETCO 4th St CR 29 CR 40 LLC property without a permit.

125. The Debtor incurred $46,179.00 in electrical expenses to erect the building on the WETCO 4th St CR 29 CR 40 LLC property. **Exhibit 1**,

126. The Debtor billed the $46,179.00 in electrical expenses for the building erected on the WETCO 4th St CR 29 CR 40 LLC property to Western Equipment.

127. The Debtor was not authorized to bill Western Equipment for any work completed on the WETCO 4th St CR 29 CR 40 LLC property.

128. Upon the foregoing discoveries, Craig Sparrow then fired the Debtor, and on May 19, 2025, and the Sparrows commenced an investigation into all of the Debtor's activities, which eventually led to the following discoveries:

a. On May 21, 2025, the Debtor filed a voluntary petition for a Chapter 7 bankruptcy known as *Manuel Agripino, Debtor*, Case No. 25−13109−TBM in the United States Bankruptcy Court, District of Colorado.

b. On May 22, 2025, a forged set of "articles of incorporation" for WETCO 4th St CR 29 CR 40 LLC was recorded with the Weld County Clerk and Recorder, as Recording No. 5031011, falsely stating that Sharon Sparrow and MelMan Trust LLC are 50 percent owners of said limited liability company and falsely stating the document was signed on July 22, 2024.

   i. MelMan Trust LLC is not an owner of 4th St CR 29 CR 40 LLC.

   ii. When the Debtor recorded a set of articles of incorporation for WETCO 4th St CR 29 CR 40 LLC with the Weld County Clerk and Recorder, Recording No. 5031011, the Debtor knew the document was forged.

   iii. Said "articles of incorporation" falsely state the document was signed on July 22, 2024, and bear the forged signature of

Sharon.

iv. The Debtor forged the articles of incorporation for WETCO 4th St CR 29 CR 40 LLC.

c. On May 22, 2025, a forged set of "articles of incorporation" for WETCO Solar was recorded with the Weld County Clerk and Recorder, as Recording No. 5031012, falsely stating that Sharon Sparrow and MelMan Trust LLC are 50 percent owners of said limited liability company.

i. The Debtor forged the WETCO Solar articles of incorporation.

ii. When the Debtor recorded a set of articles of incorporation for WETCO Solar with the Weld County Clerk and Recorder, Recording No. 5031012, the Debtor knew the document was forged.

iii. Said "articles of incorporation" falsely state that the document was signed July 22, 2024.

iv. Additionally, the forged articles of incorporation bear the forged signature and initials of Sharon Sparrow.

d. [OMITTED – not established.]

i. The Debtor was never the "Manager" of WETCO 4th St CR 29 CR 40 LLC.

ii. The Debtor never had authority to quitclaim the WETCO 4th St CR 29 CR 40 LLC property to Overlook.

iii. The Debtor recorded a forged quitclaim deed from with WETCO 4th St CR 29 CR 40 LLC to Overlook with the Weld County Clerk and Recorder, as Recording No. 5031496, stating that the Debtor is the "Manager" of WETCO 4th St CR 29 CR 40 LLC..

iv. The Debtor forged the quitclaim deed from WETCO 4th St CR 29 CR 40 LLC to Overlook for the WETCO 4th St CR 29 CR 40 LLC property.

e. On June 19, 2025, the Debtor filed a forged Statement of Change to Add an Attachment with the Colorado Secretary of State falsely claiming to be the "Managing Member" of WETCO 4th St CR 29 CR 40 LLC and submitted the forged "articles of incorporation" that had previously been wrongfully recorded as Recording No. 5031011 with the Weld County Clerk and Recorder and which bear the forged

initials and signature of Sharon.

i. The Debtor was never the "Managing Member" of WETCO 4th St CR 29 CR 40 LLC

129. On October 4, 2024, WETCO 4th St CR 29 CR 40 LLC entered into a Contract to Buy and Sell Real Estate (Land) as seller with Pocket Change Properties II, LLC as buyer to sell land owned by WETCO 4th St CR 29 CR 40 LLC for a sale price of $1,800,000. Four Amend/Extend agreements were executed which (a) corrected the legal description; (b) continue the closing date through July 30, 2025; (c) continue the closing date through January 30, 2026; and (d) continue the closing date through April 30, 2026.

130. On April 28, 2026, buyer Pocket Change Properties II, LLC terminated the Contract to Buy and Sell Real Estate (Land) because clouded title could not be cleared timely.

131. [OMITTED – not established.]

132. On January 22, 2026, the Plaintiffs filed the Complaint Objecting to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2), (4), and (6) and Related claims, initiating this adversary proceeding.

133. On February 17, 2026, the Plaintiffs filed the Amended Complaint Objecting to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2), (4), and (6) and Related Claims and corresponding Motion to Allow Amended Complaint (the "Amended Complaint").

134. On February 19, 2026, the Court entered its Order Allowing Amended Complaint.

135. [OMITTED – not established and incorrect.]

136. On May 27, 2026, Plaintiffs served the Debtor with Plaintiffs' Combined Requests for Admissions, Interrogatories, and Requests for Production of Documents and Tangible Things (the "Discovery Requests").

137. The Debtor's response to the Discovery Requests was due on June 26, 2026.

138. The Debtor failed to respond to the Discovery Requests.

139. [OMITTED – not a statement of fact but rather a conclusion of law.]

**Additional Undisputed Facts/Facts Established for Purposes of Summary Judgment**

1. The Debtor filed his voluntary Chapter 7 petition on May 21, 2025.

2. The quitclaim deed to Overlook Holdings LLC was notarized and recorded on May 27, 2025 — six days after the petition date.

3. The articles of incorporation for WETCO 4th St CR 29 CR 40 LLC and WETCO Solar Farm LLC that Plaintiffs allege were forged were recorded on May 22, 2025 — one day after the petition date.

4. The Statement of Change that Plaintiffs allege was forged was filed with the Colorado Secretary of State on June 19, 2025 — twenty-nine days after the petition date.

5. Plaintiffs discovered the conduct they complain of on May 19, 2025, and terminated Defendant that day — two days before the petition.

6. [OMITTED.]

7. Craig Sparrow verifies the damages calculation "regarding our claim for violation of the Colorado Trust Fund Statute." No such claim is pleaded in the Amended Complaint or asserted in the Motion.

8. Plaintiffs submitted no affidavit from Sharon Sparrow, from Rocky Ridge Civil Engineering or its president Joel Seamons, from Spruance Consulting LLC, from Pocket Change Properties II, LLC, or from any financial institution.

9. Craig Sparrow swears the EPA Consent Decree and associated criminal charge "arose from my wife's and my self-help efforts to remediate flood damage on the Two Rivers property by backfilling without a required permit a section of the property that constituted wetlands."

10. Craig Sparrow swears that over the five years preceding Defendant's involvement, Plaintiffs "had put together a team of attorneys and other professionals who worked over the years on a series of remediation plans approved by the EPA and the Town of Milliken."

11. Craig Sparrow swears that Kenny Schell "came into Western Equipment's offices inquiring whether my wife and I had any land in the Platteville, Colorado area to sell." Craig Sparrow directed Schell to contact Defendant.

12. The Contract to Buy and Sell Real Estate was dated October 4, 2024. Four Amend/Extend agreements extended the closing date to April 30, 2026.

13. There were eleven months and three days between the May 27, 2025, recording and the April 30, 2026 closing deadline. Plaintiffs offer no evidence of any effort to clear title during that period, and no evidence of the cost of doing so.

14. [OMITTED.]

15. Plaintiffs' Request for Admission No. 13 asks Defendant to admit that the steps he took to create the forty-seven limited liability companies "were ineffective to create such entities." Three of the six Plaintiffs — WETCO 1100 N Ethel Ave, LLC; WETCO 4th St

CR 29 CR 40 LLC; and WETCO Solar Farm LLC — are among those entities.

16. Plaintiffs' Request for Admission No. 49 states that WETCO Holdings LLC paid the $10,860 at issue. WETCO Holdings LLC is not a plaintiff in this proceeding.

17. Plaintiffs' requests for admission assign three different dates to the same quitclaim deed: October 7, 2024 (No. 18), May 27, 2025 (No. 99), and October 7, 2025 (No. 70).

18. The quitclaim deed recites execution on "the 7th day of October, 2024," and incorporates an attached site plan bearing a surveyor's certificate dated October 23, 2024.

19. Plaintiffs' Request for Admission No. 69, as written, asks Defendant to admit that he erected fencing "knowing You did own the WETCO 4th St CR 29 CR 40 LLC property and had no right or authority to erect the fencing."

20. The Debtor's Answer was filed March 3, 2026 (Doc. No. 12). Plaintiffs served their requests for admission on May 27, 2026 — nearly three months later. In the Answer, the Debtor specifically denies some matters the Plaintiffs seek to establish through the requests for admission.

21. The Debtor was an appointed member of the Gilcrest Town Board from November 2024 and was elected mayor pro tem in January 2025.

22. Answer ¶¶ 51, 52, and 61(f) aver that Sharon Sparrow represented that invoices needed to be created so MelMan Environmental could be paid in full for its services, that she herself created certain invoices, and that she requested the checks from the MelMan entities.

23. Answer ¶ 15 avers that the amounts Defendant charged "reflected the reasonable value of the services rendered."

24. Answer ¶ 61(b) avers that on October 16, 2024, Sharon Sparrow executed documents making MelMan Trust LLC a fifty percent owner.

25. MelMan Trust LLC and MelMan Environmental Corporation filed suit against all six Plaintiffs in Weld County District Court on August 4, 2025, including a proceeding under C.R.C.P. 105.1 concerning the very instruments Plaintiffs call forgeries. The authenticity of those instruments is being litigated in that forum.